294 N.J. Super. 592 (1996)
684 A.2d 77
JOYCE A. MACK, PLAINTIFF-APPELLANT,
v.
PASSAIC VALLEY WATER COMMISSION AND THE BOROUGH OF LODI, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued August 28, 1996.
Decided November 6, 1996.
Before Judges KESTIN and HUMPHREYS.
Gary Moore argued the cause for appellant (Mr. Moore, on the brief).
*593 Donald T. Okner argued the cause for respondent Passaic Valley Water Commission (Dwyer, Connell & Lisbona, attorneys; Mr. Okner, on the brief).
The opinion of the court was delivered by HUMPHREYS, J.A.D.
Plaintiff brought suit for injuries sustained in an automobile accident in 1993. She alleges the defendants did not maintain the road in a safe condition. Summary judgment was granted to the defendants on the ground that plaintiff's injuries were not permanent within the meaning of N.J.S.A. 59:9-2(d). Plaintiff appeals. She contends that she sustained a permanent loss of bodily function.
The primary issue is whether plaintiff's alleged temporomandibular joint ("TMJ") injury meets the statutory standard. TMJ has been described as pain affecting the head, jaw and face which is believed to result when the temporomandibular joint (jaw joints) and the muscles and ligaments that control and support them do not work together correctly. See American Medical Association, Encyclopedia of Medicine 969 (Charles B. Clayman ed. 1989). One cause may be displacement of the joint as a result of jaw, head or neck injuries. Ibid. After careful consideration of the record and the arguments of counsel, we conclude that plaintiff has established a material question of fact as to whether she has sustained a permanent loss of bodily function within the meaning of N.J.S.A. 59:9-2(d). Accordingly, we reverse the grant of summary judgment.

I
In an action against a public entity or a public employee, the plaintiff must meet the threshold requirements of N.J.S.A. 59:9-2(d) in order to recover damages for pain and suffering. The statute provides:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on *594 the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service. [Id.]
The motion judge said that "it was a very close call" but the plaintiff's medical doctor had not presented any "objective reasons" why the injury was permanent. The judge said "there is no permanency in, as it relates to the statute or the cases interpreting the statute. It is still the same kind of subjective pain no matter what Dr. Rutkowski gave me in his little addition to his original report, it comes out the same."
Plaintiff's certification, submitted in 1995, in opposition to the summary judgment motion supports her claim of a permanent injury. The accident occurred two years earlier. Plaintiff states in her certification that she continues to suffer from constant headaches, daily dizziness lasting up to thirty minutes, total loss of taste and smell, acute pains in her skull with a warm sensation which follows most of the time, facial twitching on her left side when she experiences headaches, ringing in her ears off and on, pressure in her jaw bone when she bites something for the first time on that particular day accompanied by an intense pain in the back of the jawbone. She experiences headaches and feels pressure on the left side of her face which causes her left eye to feel as if it is being pushed out. She feels pain where her neck meets her shoulder on the right side. She is being treated with painful cortisone injections. Further, she has numbness in both wrists and elbow and has pain in her lower back and buttocks extending down to both legs. She must eat only soft foods. She cannot bend, cannot walk longer than twenty minutes, and cannot tolerate sitting or standing for a long time. Grocery shopping and doing the laundry are painful because of the lifting required and she must avoid sweeping and mopping at home. When she worked last, she was unable to work longer than four hours a day.
*595 Plaintiff's medical reports support plaintiff's claim of a permanent injury. Dr. Rutkowski, a dentist, concluded in a report in October 1993 that plaintiff sustained permanent injuries to the craniomandibular articulation and the attendant musculature and ligaments (both craniomandibular and craniocervical) and that the injuries would lead to further degenerative changes of the craniomandibular articulation and further impairment of mandibular function. He recommended certain treatment. He concluded she would be limited to softer semi-solid food intake which would result in a "total body impairment rating of 5-19 percent impairment, as established in the Guidelines for the Evaluation of Permanent Impairment, American Medical Association, Fourth Edition."
He further found that this "compromise of the masticatory system conditioned by these injuries also dictates certain lifestyle modifications: (1) no hard or chewy foods; (2) no gum chewing; (3) no excessive talking; (4) no singing; (5) mouth not to be opened wide; (6) during yawning, mandibular opening to be controlled; (7) restriction of all procedures that will require excessive jaw movements."
Dr. Rutkowski's conclusions were buttressed by various medical tests he conducted. Dr. Rutkowski submitted an additional report, dated August 31, 1995, in which he stated:
The following are additional objective findings on Joyce Mack substantiating the injuries sustained in the above referenced accident.
Computerized Mandibular Scan is used to objectively measure and record movements of the jaw in three dimensions. The ability to track the movements of the jaw allows for a very precise determination of the correct jaw to skull relationship. It is also useful in calculating rest position, neuromuscular position of the mandible and for assessing velocity of the mandible during normal movements. Because of its precise accuracy, computerized mandibular scan allows the clinician to objectively measure those movements which were heretofore only able to be estimated. This procedure is extremely valuable for initial patient evaluations, as well as for monitoring treatment results.
Computerized Mandibular Scan on Joyce Mack revealed abnormally slow and erratic opening and closing velocities. The frontal trace showed a 3.3 mm deviation of the mandible to the right on opening. The patient's maximum opening is 38.8 *596 mm. The horizontal trace also showed the deviation of the mandible to the right on opening.
Computerized Sonography is used to record and analyze temporomandibular joint sounds. It provides important diagnostic information about the pathophysiology and progression of internal derangements, using a safe, painless, non-invasive technique which enables the doctor to prescribe the most effective treatment plan; thereby, allowing for documentation of the presence of internal morphofunctional disk derangement and other disorders in the extremely complex temporomandibular joint.
Computerized Sonography on Joyce Mack revealed a moderate probability of disk dislocation without reduction in both the right and left temporomandibular joints.
Electromyography is a traditional medical diagnostic tool utilized to measure muscle activity. It is used to assess the resting activity of muscles and to determine whether muscle splinting and/or muscle spasms are present. It objectively qualifies the degree of dysfunction that is being displayed. Since increased muscle activity may be the key culprit behind many symptoms associated with temporomandibular disorders, the value of being able to objectively identify, as well as quantify its presence, is of paramount importance. By objectively quantifying the functional muscle activity and the work being produced by the muscle, many forms of muscle dysfunction can be identified. This procedure is extremely valuable for initial patient evaluations, as well as for monitoring treatment results during and following therapy.
Electromyography (EMG) findings on Joyce Mack showed elevated resting electrical activity in the left temporalis muscle. During clenching, there was a significant imbalance in muscle activity with masseter muscle activity much less than temporalis activity on both right and left sides. Normally, masseter activity should equal or exceed temporalis activity during clenching on both sides. Also, during clenching, masseter activity on the right side was much less than masseter activity on the left side. Masseter activity should be equal on both right and left sides during clenching. The electromyography studies also revealed an aberrant swallowing pattern.
Thermography is a visual means of measuring the pathophysiology within the soft tissues of the musculoskeletal system. Thermal changes on the surface of the skin can be correlated with underlying pathology. In the case of temporomandibular patients, thermography is used to identify and locate myofascial trigger points, nerve root impingements and injuries, as well as other forms of soft tissue pathology which may produce symptoms. It is useful in determining the relative acuteness or chronicity of the pathology identified. In the diagnosis of complex headache patterns, thermography demonstrates asymmetries and helps to differentiate between headaches of muscle contracture and vascular origins.
Facial Thermography on Joyce Mack revealed an abnormal thermogram with significant hypothermia over the right and left masseter muscle regions.
Dr. Rutkowski concluded in a report dated October 19, 1995 that:

*597 The injuries to the craniomandibular articulation and the attendant musculature and ligaments are permanent in nature, therefore, treatment is directed toward the relief of symptoms and improved function.
Surgery is rarely indicated for the treatment of injuries involving the temporomandibular joints and would only be considered as a last resort after several months of more conservative treatment has been unsuccessful. Since the injuries incurred by Ms. Mack involve multiple structures including muscles, ligaments and joints, it would be unlikely that surgery directed toward one of these areas would be of much benefit. Therefore, the treatment of choice for Ms. Mack's injuries is orthopedic repositioning appliance therapy and physical therapy modalities for symptomatic relief and improved function.
Dr. Laskin, a neurologist for the plaintiff, found that some of plaintiff's injuries were permanent. Dr. Laskin stated in a report dated July 31, 1995: "My final diagnosis continues to be cerebral concussion with post-concussion syndrome, post-traumatic headaches, traumatic TMJ dysfunction, and chronic cervical sprain with radiculopathy, and post-traumatic carpal tunnel syndrome." Dr. Laskin stated that the prognosis is guarded and plaintiff "will likely require surgical release of the carpal tunnel syndrome with prolonged hand rehabilitation and that the dizziness and olfactory loss are, to a reasonable degree of medical probability, permanent. [(emphasis added).]
In an earlier report, dated August 11, 1994, Dr. Laskin confirmed the presence of bilateral carpal tunnel syndrome by diagnostic electromyography and nerve conduction studies.
The defendants' doctors concluded that plaintiff's injuries were not permanent. Dr. Goldstone, an orthopedist, said in a report of February 14, 1995 that:
With respect to the musculoskeletal aspects of her complaints, chiefly with relation to the shoulders, neck and back, there are clearly no musculoskeletal abnormalities identified from the history, the records which I have reviewed, or the examination which I carried out, which would suggest that there are anatomic residuals of the incident of August 1993. There is no reasonable probability that she will have any permanent residuals of that accident, and she has not lost the function of any bodily part or system.
Allegations are made regarding concussion, and you might wish to obtain a neurologic IME.
In addition, the patient received a tremendous amount of dental care for an alleged temporomandibular joint syndrome which is reported to be producing many of her complaints of headaches and neck pain. I would strongly recommend that you obtain an IME by a specialist in the field of temporomandibular joint disorder. *598 I would again note that there appears to be no anatomic basis for the orthopaedic aspects of her complaints, and that I do not find residuals of the accident.
Dr. Joseph H. Willner, a neurologist, concluded in a report dated March 7, 1995 that a neurological examination showed no objective abnormalities. He stated:
Some of Miss Mack's symptoms could be attributed to her having TMJ disease. Pain on chewing, pressure in the ear, ringing in the ears, dizziness, and headaches can all arise from that pathology. One must be skeptical, though, of that diagnosis. Miss Mack had diffuse tenderness over her face, not tenderness localized to the temporomandibular joint, and the sensory loss over her face is not caused by TMJ dysfunction, but is a psychogenic overlay.
It is interesting that Miss Mack in 1991 had neurological symptoms which could not be explained. The same is true today. Miss Mack's symptoms are psychological, not physical.
These conflicting diagnoses pose serious factual issues as to the permanency of plaintiff's injuries.

II
In Thorpe v. Cohen, we said that the threshold issue presented in the cases against public employees and entities is similar to the verbal threshold issues involved in the automobile `no fault' law, N.J.S.A. 39:6A-8(a). 258 N.J. Super. 523, 526, 610 A.2d 878 (App. Div. 1992).
In the leading case on the verbal threshold, Oswin v. Shaw, the Court said that once "a court determines that evidence bearing on a plaintiff's injuries could, if believed by the factfinder, satisfy the statutory verbal-threshold requirement, any disputed issues regarding the nature and extent of those injuries must be decided by the jury." 129 N.J. 290, 313, 609 A.2d 415 (1992). However, the Supreme Court also said that the plaintiff must show a "material disputed fact by credible, objective medical evidence." Id. at 314, 609 A.2d 415.
Applying the Oswin standard here, the critical question is whether plaintiff has presented objective and credible medical evidence, if believed by a factfinder, of a permanent loss of a bodily function. We find that plaintiff has presented such evidence. Doctor Rutkowski concludes based on his medical tests *599 that plaintiff has a TMJ injury and that it is permanent. Dr. Willner, in his report for the defendants, admits that the plaintiff's symptoms "could be attributed to her having TMJ disease." Plaintiff has undergone extensive treatment for this condition. Her complaints are not minor, especially her contention that she has suffered for some years from a "total loss of taste and smell," can eat only soft foods, cannot bend, cannot walk longer than twenty minutes, cannot tolerate sitting or standing for a long time and cannot work longer than four hours a day. Further, Dr. Rutkowski concludes that plaintiff's injuries will lead to further degenerative changes of the craniomandibular articulation and further impairment of mandibular function.
Dr. Rutkowski's findings are not based solely upon the subjective complaints of the plaintiff. He sets forth in his August 31st report a number of tests which he used in making his diagnosis: (1) computerized mandibular scan; (2) computerized sonography; (3) electromyography; and (4) thermography.
The tests and his findings are specifically described in his report. The tests do not appear to be based only on the plaintiff's pain responses, and therefore are not comparable to the "range of motion tests" criticized in Oswin v. Shaw, supra, 129 N.J. at 320, 609 A.2d 415. According to Dr. Rutkowski, computerized mandibular scan has "precise accuracy" and is "extremely valuable for initial patient evaluations, as well as for monitoring treatment results." According to Dr. Rutkowski, the scan on plaintiff "revealed abnormally and erratic opening and closing velocities."
Dr. Rutkowski stated that computerized sonography is used to record and analyze temporomandibular joint sounds. He found that computerized sonography on the plaintiff "revealed a moderate probability of disk dislocation without reduction in both the right and left temporomandibular joints."
According to Dr. Rutkowski, electromyography is a traditional medical diagnostic tool which is used to measure muscle activity. Dr. Rutkowski said that being able to objectively identify and quantify the presence of TMJ through this tool "is of paramount *600 importance." His findings based on the electromyographic test "showed elevated resting electrical activity in the left temporalis muscle. During clenching, there was a significant imbalance in muscle activity with masseter muscle activity much less than temporalis activity on both right and left sides. Normally, masseter activity should equal or exceed temporalis activity during clenching on both sides." In Costa v. Perez, diagnostic test results of electromyographic studies taken together with other data were sufficient to withstand defendant's summary judgment motion on a verbal threshold issue. 272 N.J. Super. 108, 115, 117, 639 A.2d 372 (App.Div. 1994).
Dr. Rutkowski also used a thermographic test. The validity of thermographic tests has been questioned. However, in Thermographic Diagnostics v. Allstate Ins. Co., the Supreme Court stated it was satisfied that the "trial court's finding that thermography has medical value as a diagnostic procedure was supported by substantial, reliable and credible evidence." 125 N.J. 491, 513, 593 A.2d 768 (1991). Consequently, the expense of thermographic examinations warranted by the circumstances could be recovered from insurance carriers affording coverage under the Personal Injury Protection (PIP) statute. N.J.S.A. 39:6A-2(e), -4(a); see generally New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 to -35.
We find no basis for disregarding these tests. Defendants have not in their appellate brief challenged the tests as being unreliable or as being dependent only upon the subjective complaints of the patient.
In sum, the findings of plaintiff's dentist, based not only on plaintiff's subjective complaints but also on what appear to be objective and reliable medical tests, furnish sufficient credible, objective medical evidence of a permanent injury within the meaning of N.J.S.A. 59:9-2(d). This evidence raises genuine material issues of fact which must be determined by the trier of fact and not by summary judgment. Brill v. Guardian Life Insurance Company of America, 142 N.J. 520, 666 A.2d 146 *601 (1995); Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954).
Reversed and remanded for further proceedings consistent with this opinion.