696 A.2d 619

BERTHA BROOKS AND JOHN L. BROOKS, HER HUSBAND, PLAINTIFFS–RESPONDENTS, v. WILLIE MAE ODOM AND NEW JERSEY TRANSIT BUS OPERATIONS, INC., DEFEN-DANTS–APPELLANTS, AND PORT AUTHORITY OF NEW YORK AND NEW JERSEY, DEFENDANT.

Argued April 28, 1997—Decided July 15, 1997.

396 

*Jeffrey A. Miller*, Assistant Attorney General argued the cause for appellants (*Peter Verniero* Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Deputy Attorney General, of counsel; *Valerie L. Egar*, Deputy Attorney General, on the brief).

*Eric G. Kahn* argued the cause for respondents (*Javerbaum Wurgaft & Hicks*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal presents two issues. The first issue is what constitutes a "permanent loss of a bodily function" under the New Jersey Tort Claims Act ("The Act" or "The Tort Claims Act"), *N.J.S.A.* 59:9–2(d). Second, we must decide whether plaintiff, Bertha Brooks ("plaintiff"), may recover from defendants Willie Mae Odom and New Jersey Transit Corporation ("New Jersey Transit") (jointly described as "defendants") her co-payments and deductible amounts under her health insurance policy.

The Law Division granted summary judgment for defendants. It held that plaintiff's injuries did not constitute a permanent loss of a bodily function and that plaintiff could not recover her out-of-pocket medical expenses. In an unreported opinion, the Appellate Division reversed. We granted defendants' petition for certification, 147 *N.J.* 260, 686 *A.2d* 762 (1996). We reverse the judgment of the Appellate Division, and reinstate that of the Law Division.

## I.

This matter arises on defendants' motion for summary judgment. Consequently, we assume the truth of plaintiff's version of the facts, giving plaintiff the benefit of all favorable inferences that version supports. *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 523, 666 *A.2d* 146 (1995); *Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 *N.J.* 125, 135, 516 *A.2d* 220 (1986). On November 18, 1991, plaintiff's car was parked on Clinton Place, Newark. As plaintiff entered her car, a New Jersey Transit bus driven by Odom struck the car door, knocking plaintiff into the car. An ambulance drove plaintiff to the emergency room at Newark Beth Israel Hospital, where she complained of pain in her neck, back, and head. The hospital took X-rays (all of which were normal except for "degenerative changes at C5–C6"), prescribed medication, fitted plaintiff with a cervical collar, and released her.

Plaintiff next consulted Dr. Jack Siegel. After Dr. Siegel administered twelve heat treatments to plaintiff's back, she stopped seeing him because the treatments were ineffective. On July 8, she consulted Dr. Anthony Keiser.

In August 1992, plaintiff started treatment with Sall/Myers Associates at their Irvington office. She complained of headaches, dizziness, blurred vision, pain and stiffness in her neck, upper and lower back, pain radiating in her left shoulder, and increased discomfort on a change in the weather. Dr. Myers's examination of her neck and back revealed mild flattening of the curve, tenderness and hardness, and decreased motion. He diagnosed

plaintiff's condition as "residual of post-traumatic myositis and fibromyositis of the cervicodorsal and lumbosacral region and post-traumatic headache syndrome." Myositis is the "inflammation of muscle tissue." Clayton L. Thomas, ed., *Taber's Cyclopedic Medical Dictionary* 1091 (15th ed. 1985). Fibromyositis is "characterized by pain, tenderness, and stiffness of joints, capsules, and adjacent structures." *Id.* at 618.

Dr. Myers treated plaintiff with physical therapy and a TENS (transcutaneous electrical nerve stimulation) unit, which applies mild electrical stimulation to an affected area. X-rays revealed small marginal spurs in the upper lumbar vertebra and disc space narrowing at C5–C6 and C6–C7, with reversal of curvature of the spine.

Dr. Peter M. Crain, a neurologist and psychiatrist, diagnosed plaintiff as suffering from post-traumatic headaches. An electromyogram ("EMG") reflected elevations in activity in the muscles on both sides of the face and neck with significant elevations at the T1 (thoracic) paraspinal sites.

Notwithstanding several months of therapy, plaintiff's neck and back pain continued. On December 10, 1992, Dr. Myers performed thermograms on her neck and back. The lumbar thermogram revealed L4 and L5 fiber irritation and pelvic lean. The cervical and thoracic thermogram was "[a]bnormal with thermographic diagnoses of bilateral cervical and thoracic trapezius myositis with trigger point formation, myositis of the sternal muscles, costochondritis and trigger point formation in the right anterior deltoid and right pectoralis." A CAT scan was normal.

In his final report, dated February 2, 1993, Dr. Myers noted residual complaints of recurring discomfort in plaintiff's neck, upper, mid and lower back, as well as occasional headaches. Her physical examination revealed straightening of the cervical curve; diffuse tenderness in the posterior cervical area evidenced by muscle spasms; spasm of the posterior and lateral cervical musculature; and a decreased range of motion on flexion and rotation. The examination of her dorsal spine revealed paravertebral

spasms with tenderness in the trapezoid muscles, and a decreased range of motion of flexion. In plaintiff's lower lumbar area, Dr. Myers detected a palpable muscle spasm and a decreased range of motion.

Dr. Myers's discharge diagnosis was residuals of post-traumatic headaches, residuals of flexion/extension injury of the cervical dorsal and lumbar spine with post-traumatic myositis and fibromyositis. He concluded that there was a direct causal relationship between plaintiff's condition and the accident. His objective findings were hardness, spasm, and tenderness with secondary scar tissue formation. Dr. Myers concluded that plaintiff had sustained a significant and permanent loss of function with chronic pain that was exacerbated by the usual activities of daily living. He further concluded that plaintiff's overall prognosis for significant improvement was poor.

After the accident, plaintiff missed eight days of work and stayed at home for two weeks. She has since returned to work as a teacher's aide, but claims she cannot sit or stand for long without experiencing pain. She still suffers from headaches, dizziness, and severe lower back pain that radiates into her left leg. Finally, she has difficulty in performing household chores, including vacuuming, carrying groceries, or other activities that require lifting or bending. Plaintiff seeks recovery for her pain and suffering. Her husband, John Brooks, asserts a derivative claim for loss of her services.

## II.

■ The initial issue is whether plaintiff has suffered a "permanent loss of a bodily function" within the meaning of *N.J.S.A.* 59:9–2(d). That statute provides in relevant part:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function.

> [*N.J.S.A.* 59:9–2(d).]

Although plaintiff originally joined the Port Authority of New York and New Jersey as a defendant, she has never served it with a summons and complaint. The Law Division granted defendants' motion for summary judgment, concluding that the Act imposes a stricter threshold than the verbal threshold in the No–Fault Law, *N.J.S.A.* 39:6A–1 to –35. The court reasoned that even under the No–Fault Act, plaintiff could not recover. Finally, the court ruled that plaintiff could not recover her deductible or co-payment expenses.

The Appellate Division reversed. It found that evidence of muscle spasm, loss of spinal curvature, and marginal spurs constituted objective evidence of plaintiff's injury. Significantly, the court further found that the evidence established that plaintiff's injuries were permanent. The court noted that plaintiff was "unable to sit or stand for long periods of time without experiencing pain," and that she encountered continuing difficulty in "performing [her] daily household chores, including vacuuming, carrying groceries and anything which requires lifting or bending." It also ruled that plaintiff could recover her deductible and co-payment amounts.

■ This appeal raises an issue of statutory interpretation. When construing a statute, the judicial role is to give effect to the legislative intent. *State v. Madden,* 61 *N.J.* 377, 389, 294 *A.*2d 609 (1972). Sometimes, a court need look no further than the statutory language. *Munoz v. New Jersey Automobile Full Ins. Underwriting Ass'n,* 145 *N.J.* 377, 384, 678 *A.*2d 1051 (1996). When, however, the statutory language is ambiguous, a court generally turns to the legislative history, statutory purpose, and related legislation. *MCG Assocs. v. DEP,* 278 *N.J.Super.* 108, 119–20, 650 *A.*2d 797 (App.Div.1994) (citations omitted). Even with the help of canons of statutory construction, legislative intent can be elusive.

On this appeal, our task is to ascertain the legislative intent in the provision in *N.J.S.A.* 59:9–2(d) against recovery for pain and suffering except "in cases of permanent loss of a bodily function." We read the provision in the light of the general legislative intent

in the Act to establish immunity as the general rule and to subject a public entity for liability only as the Act provides. *N.J.S.A.* 59:2–1.

The Act does not define the terms "permanent," "loss," "bodily," or "function." In the absence of statutory definitions, dictionaries can shed light on the presumed intent of the legislature. "Function" means "[t]he action performed by any structure. In a living organism this may pertain to a cell or part of a cell, tissue, organ or system of organs." *Taber's, supra,* at 651. "Loss" means "the act of losing possession" and the "decrease in amount, magnitude or degree." *Webster's New Collegiate Dictionary* 675 (1987). Finally, "bodily" is defined as "pertaining to or concerning the body; of or belonging to the physical constitution." *Black's Law Dictionary* 159 (5th ed. 1991). Those definitions, although helpful, are not dispositive.

■ Hence, we turn to the Act's history and purpose. The purpose of the Act was to reestablish the general rule of the immunity of public entities from liability for injuries to others. Pane, *New Jersey Practice,* Local Government Law § 589 at 17 (stating Act's purpose was to stabilize constant erosion of sovereign immunity by judicial decisions). Underlying the reenactment of immunity was the Legislature's concern about that liability on the public coffers. *Report of the Attorney General's Task Force on Sovereign Immunity* 10 (1972) ("Task Force").

As the Task Force stated:

> The limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances.
>
> [Comment, *N.J.S.A.* 59:9–2.]

Both the history and purpose of the Act suggest that the Legislature intended a chary interpretation of a public entity's exposure to liability.

■ To recover under the Act for pain and suffering, a plaintiff must prove by objective medical evidence that the injury is

permanent. Temporary injuries, no matter how painful and debilitating, are not recoverable. Further, a plaintiff may not recover under the Tort Claims Act for mere "subjective feelings of discomfort." *Ayers v. Township of Jackson*, 106 *N.J.* 557, 571, 525 *A.2d* 287 (1987). Judicial and secondary authority interpreting the phrase "permanent loss of a bodily function" is scant. One recognized text states "[t]o be considered permanent within the meaning of the subsection, an injury must constitute an 'objective' impairment, such as a fracture." Harry A. Margolis & Robert Novack, *Claims Against Public Entities* 159 (1996). Absent such an objective abnormality, a claim for permanent injury consisting of "impairment of plaintiff's health and ability to participate in activities" merely iterates a claim for pain and suffering. *Ibid.*

According to the Appellate Division, a claim for emotional distress is recoverable if it results "in permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight." *Srebnik v. State*, 245 *N.J.Super.* 344, 351, 585 *A.2d* 950 (App.Div.1991). Consistent with *Srebnik*, one part of the Appellate Division found that a chronic lumbo-sacral sprain with a fifteen percent permanent disability did not constitute sufficient objective evidence to survive the defendants' motion for summary judgment. *Thorpe v. Cohen*, 258 *N.J.Super.* 523, 610 *A.2d* 878 (App.Div.1992). By comparison, another part has ruled that a plaintiff could survive a motion for summary judgment when her complaints included total loss of taste and smell, as well as constant headaches, daily dizziness, acute pain in her skull, facial twitching, an inability to eat hard foods, ringing in her ears, and the inability to bend or walk for longer than twenty minutes. *Mack v. Passaic Valley Water Comm'n*, 294 *N.J.Super.* 592, 684 *A.2d* 77 (App.Div.1996). As those cases indicate, permanent loss of eyesight, taste and smell satisfy the statutory standard.

In concluding plaintiff has sustained a permanent loss of a bodily function under the Tort Claims Act, the Appellate Division in the present case relied on decisions interpreting the No–Fault Act. In some respects the threshold issue in actions against public

entities is similar to the verbal-threshold issue in no-fault cases. *Thorpe, supra,* 258 *N.J.Super.* at 526, 610 *A.*2d 878. Under both statutes, a plaintiff must adduce objective evidence of claimed injuries. *Oswin v. Shaw,* 129 *N.J.* 290, 314, 609 *A.*2d 415 (1992) (stating under No–Fault Act plaintiff must show "material disputed fact by credible objective medical evidence"); *Mack, supra,* 294 *N.J.Super.* at 598, 684 *A.*2d 77 (stating in Tort Claims Act case "the critical question is whether plaintiff has presented objective and credible medical evidence if believed by a factfinder, of a permanent loss of bodily function").

The substantive standards in the two statutes, however, differ. The Tort Claims Act limits recovery for pain and suffering to incidents in which the plaintiff has sustained either "[ (1) ] permanent loss of a bodily function; [ (2) ] permanent disfigurement; or [ (3) ] dismemberment." *N.J.S.A.* 59:9–2(d).

By comparison, the No–Fault Act permits recovery in cases involving:

[ (1) ] death;

[ (2) ] dismemberment;

[ (3) ] significant disfigurement;

[ (4) ] a fracture;

[ (5) ] loss of a fetus;

[ (6) ] permanent loss of the use of a body organ, member, function or system;

[ (7) ] permanent consequential limitation of use of a body organ or member;

[ (8) ] significant limitation or use of a body function or system; or

[ (9) ] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment.

[*N.J.S.A.* 39:6A–8(a).]

Thus, the No–Fault Act contains nine categories or standards under which a plaintiff may seek recovery. Generally speaking, the categories start with more serious injuries and proceed to less serious ones. Under the relevant section of the Tort Claims Act, in contrast, a plaintiff may recover only if he or she suffers a "permanent loss of a bodily function." The most comparable

standard in the No–Fault Act is "permanent loss of the use of a body organ, member, function or system" (category six), a standard that requires more serious injuries than do categories seven, eight and nine.

Under the No–Fault Act, moreover, a plaintiff may merge the requirements of one category into another. *See, e.g., Jefferson v. Freeman,* 296 *N.J.Super.* 54, 60–61, 685 *A.*2d 1357 (App.Div.1996) (examining whether plaintiff's injuries fit into verbal threshold categories seven, eight or nine); *Pickett v. Bevaqua,* 273 *N.J.Super.* 1, 3, 640 *A.*2d 1173 (App.Div.1994) (examining whether plaintiff's injuries fit into verbal threshold categories eight or nine); *Polk v. Daconceicao,* 268 *N.J.Super.* 568, 570, 634 *A.*2d 135 (App.Div.1993) (examining whether plaintiff's injuries fit into verbal threshold categories six, seven or eight); *Phillips v. Phillips,* 267 *N.J.Super.* 305, 308, 631 *A.*2d 564 (App.Div.1993) (examining whether plaintiff's injuries fit into verbal threshold categories six, seven or eight); *Dabal v. Sodora,* 260 *N.J.Super.* 397, 400, 616 *A.*2d 1297 (App.Div.1992) (examining whether plaintiff's injuries fit into verbal threshold categories six, seven or eight); *Levine v. Miller,* 272 *N.J.Super.* 512, 515, 517, 640 *A.*2d 363 (Law Div.1993) (examining whether plaintiff's injuries fit into verbal threshold categories four or six).

We cannot find any reported case, and counsel has not cited any, considering recovery under category six alone. Apparently, plaintiffs seeking to recover under category six also seek recovery under other categories. *See Siriotis v. Gramuglia,* 254 *N.J.Super.* 223, 231, 603 *A.*2d 154 (Law Div.1991) (referring in case asserting claims under categories six, seven and eight to "the lack of case law interpreting a Type 6 injury in New Jersey"). In effect, a plaintiff seeking to recover under the No–Fault Act may recover not only for "a permanent loss of the use of a body organ, member, function or system" (category six), but also for the "permanent consequential limitation of use" of any such organ or member (category seven), or the "significant limitation or use of a body function or system" (category eight). Under the No–Fault Act, therefore, a claimant may recover for a permanent injury that

merely imposes a limitation on the use of his or her back. The No-Fault Act manifests legislative recognition that something less than a "permanent loss of the use of a body organ, member, function or system" would satisfy the verbal threshold.

■ In the Tort Claims Act, however, the Legislature did not modify the requirement of a "permanent loss of a bodily function" by stating that a mere limitation on a bodily function would suffice. Although the legislative intent in the Tort Claims Act is not completely clear, we believe that the Legislature intended that a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial. A total permanent loss of use would qualify. We doubt, however, that the Legislature intended that a claimant could recover only for losses that were total. As the Workers' Compensation Act demonstrates, the Legislature is aware of the distinction between permanent injuries that are total and those that are partial. *N.J.S.A.* 34:15–12(b) & (c). In the Tort Claims Act, however, the Legislature did not specify that the right to recover was limited to injuries that were total. We conclude that under that Act plaintiffs may recover if they sustain a loss that is substantial.

In reviewing the sufficiency of plaintiff's case, we accept that she experiences pain and that the limitation of motion in her neck and back is permanent. Still, she can function both in her employment and as a homemaker. In brief, she has not sustained "a permanent loss of a bodily function" within the meaning of *N.J.S.A.* 59:9–2(d).

### III.

■ The remaining issue is whether plaintiff may recover from defendants her out-of-pocket expenses for co-payments and deductibles under her Personal Injury Protection ("PIP") coverage. The Law Division denied recovery, but the Appellate Division reversed. Under the No–Fault statute, a plaintiff may not recover such out-of-pocket expenses. *Roig v. Kelsey,* 135 *N.J.* 500, 641 A.2d 248 (1994). The underlying policy consideration is that allowing recovery for such claims would clog the court system with

minor claims for reimbursement. *Id.* at 514, 641 *A.*2d 248. The same consideration applies to suits against public entities under the Act. We reach this conclusion notwithstanding the comment in the Task Force Report favoring reimbursement of claimants for full net economic losses. *Task Force, supra,* at 16. Given the general legislative intent in the Act to immunize public entities from liability, it would be contradictory to allow a plaintiff to recover against a public entity when he or she could not recover against a private party. We do not reach the question whether uninsured claimants who may not recover for pain and suffering under *N.J.S.A.* 59:9-2(d) may nonetheless recover the cost of their medical expenses.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division dismissing the complaint is reinstated.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.