767 A.2d 503 (2001)
337 N.J. Super. 425
Robert PONTE and Priscilla Ponte, Plaintiffs-Appellants,
v.
Richard OVEREEM and New Jersey Transit, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 6, 2001.
Decided February 26, 2001.
James J. Mahoney, Denville, argued the cause for appellants.
Paul D. Nieves, Deputy Attorney General, argued the cause for respondents (John J. Farmer, Jr., Attorney General; Mary C. Jacobson, Assistant Attorney General, of counsel; Mr. Nieves, on the brief).
Before Judges PRESSLER, CIANCIA and ALLEY.
ALLEY, J.A.D.
On March 8, 1995, Richard M. Overeem, a New Jersey Transit bus operator, was driving New Jersey Transit bus # 6329 westbound on Route 495 on the helix leading up from the Lincoln Tunnel, traveling in the far right lane. It was dark and raining. Somewhere ahead of the bus in the dark was Robert Ponte's car, immobilized in the far right-hand lane due to an electrical malfunction. For motorists who *504 have traveled the same route, this scenario may create an apprehension of impending doom equal to a ticking suitcase in a Hitchcock thriller.
The seemingly inevitable occurred. The bus driven by Overeem came upon the scene and rammed the rear of the vehicle occupied by Ponte. The aftermath fortunately was not a fatality, but plaintiff's right knee hit the dashboard from the impact, and he claims that permanent and substantial harm resulted.
In a complaint dated January 22, 1997, Robert Ponte and his wife, Priscilla Ponte, filed an action to recover for injuries that Robert Ponte sustained in the accident. Defendants, Richard Overeem and New Jersey Transit, filed a motion for summary judgment, asserting that plaintiff had failed to satisfy the verbal threshold provision of the Tort Claims Act, N.J.S.A. 59:9-2(d). By order dated February 4, 2000, the motion court granted an order for summary judgment in favor of defendants, from which plaintiffs now appeal.
Plaintiffs assert that the Law Division erred in granting defendants' motion for summary judgment because, based on the New Jersey Torts Claims Act, Ponte's injuries were substantial.
On appeal, we apply the same standard as the trial court in determining whether the grant or denial of a summary judgment motion was correct. See Kopin v. Orange Products, Inc., 297 N.J.Super. 353, 366, 688 A.2d 130 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997); Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App. Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill v. Guardian Life Insurance Company of America, 142 N.J. 520, 528-29, 666 A.2d 146 (1995).
In determining whether there is a genuine issue of material fact for summary judgment purposes, the court must ascertain "what reasonable conclusions a rational jury can draw from the evidence," a test that is similar to the one used to resolve a motion for involuntary dismissal under R. 4:37-2(b). See id. at 535, 666 A.2d 146. A motion for involuntary dismissal requires the court to determine "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." Ibid. (quoting R. 4:37-2(b)). To make the determination, the judge must accept as true all evidence that supports the position of the party defending against the motion and accord him or her the benefit of all legitimate inferences which can be deduced therefrom. Ibid. If reasonable minds could differ, the motion must be denied. Ibid.
The "essence of the inquiry" is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 536, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). The Brill Court explained the process:
Of course, there is in this process a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials. This process, however, is not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence. On a motion for summary judgment the court must grant all the favorable inferences to the non-movant. But the ultimate factfinder may pick and choose inferences from the evidence to the extent that "a miscarriage of justice under the law" is not created.
[142 N.J. at 536, 666 A.2d 146]
In 1972, the Legislature enacted the Tort Claims Act, N.J.S.A. 59:1-1 to 59:123. *505 The purpose of the Act was to reestablish the immunity of public entities while relieving some of the harsh results of the doctrine. See N.J.S.A. 59:1-2. The substance of the Act provides immunity for public entities with liability as the exception. Collins v. Union County Jail, 150 N.J. 407, 696 A.2d 625 (1997). Even where liability is present, the Act sets forth limitations on recovery. One limitation of recovery is on pain and suffering damages:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from an injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.

[N.J.S.A. 59:9-2(d).]
The issue here is whether defendants have established as a matter of law that Richard Ponte did not suffer a permanent loss of bodily function under the Tort Claims Act. To examine that issue we turn first to Brooks v. Odom, 150 N.J. 395, 696 A.2d 619 (1997), where the plaintiff sued New Jersey Transit for injuries sustained when a bus struck her open car door. Id. at 398, 696 A.2d 619. After being taken to the hospital, Mrs. Brooks had many complaints: headaches; dizziness; blurred vision; pain and stiffness in her neck, back and shoulder; and decreased motion. Ibid. Despite therapy, the plaintiff's neck and back pain continued. Id. at 399, 696 A.2d 619. She was eventually diagnosed with "residuals of post-traumatic headaches, residuals of flexion/extension injury of the cervical dorsal and lumbar spine with post traumatic mysositis and fibro-myositis." Id. at 400, 696 A.2d 619. Mrs. Brooks did return to work and performed household chores, but with some difficulty. Id. The trial court granted summary judgment to the defendants based on the nature of Mrs. Brooks' injuries. The Appellate Division reversed and the Supreme Court reinstated the Law Division judgment. Id. at 407, 696 A.2d 619. In doing so, the Court set forth the following guidance for evaluating a claim that a party's injuries warrant the allowance of pain and suffering damages:
To recover under the Act for pain and suffering, a plaintiff must prove by objective medical evidence that the injury is permanent. Temporary injuries, no matter how painful and debilitating, are not recoverable. Further, a plaintiff may not recover under the Tort Claims Act for mere "subjective feelings of discomfort." Judicial and secondary authority interpreting the phrase "permanent loss of bodily function" is scant. One recognized test states "[t]o be considered permanent within the meaning of the subsection, an injury must constitute an `objective' impairment, such as a fracture." Absent such an objective abnormality, a claim for permanent injury consisting of "impairment of plaintiff's health and ability to participate in activities" merely iterates a claim for pain and suffering.
[Id. at 402-03, 696 A.2d 619 (citations omitted).]
Next, the Court reviewed prior decisions that considered the term "permanent" within the meaning of the Tort Claims Act. See id. at 402, 696 A.2d 619. It recognized that the Appellate Division ruled that a claim for emotional distress that manifests itself "`in permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight'" is recoverable under the Tort Claims Act. Id. (citing Srebnik v. State, 245 N.J.Super. 344, 585 A.2d 950 (App.Div. 1991)), and it cited a case in which the Appellate Division held that a permanent loss of taste or smell satisfied the statutory standard. See id. (citing Mack v. Passaic Valley Water Comm'n, 294 N.J.Super. 592, 684 A.2d 77 (App.Div.1996)).
After distinguishing the No-Fault scheme from the Tort Claims Act, the Court concluded:

*506 Although the legislative intent in the Tort Claims Act is not completely clear, we believe that the Legislature intended that a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial. A total permanent loss of use would qualify. We doubt, however, that the Legislature intended that a claimant could recover only for losses that were total. As the Workers' Compensation Act demonstrates, the Legislature is aware of the distinction between permanent injuries that are total and those that are partial. In the Tort Claims Act, however, the Legislature did not specify that the right to recover was limited to injuries that were total. We conclude that under the Act plaintiffs may recover if they sustain a loss that is substantial.
[Id. at 406, 696 A.2d 619 (citation omitted).]
The Supreme Court in Brooks thus established that to clear the pain and suffering threshold under the Tort Claims Act, a plaintiff must satisfy a two-pronged standard by proving (1) an objective permanent injury, and (2) a permanent loss of a bodily function that, even if not total, is substantial. The Court also described injuries, which, if supported by medical proof, would obviously meet both prongs of the standard, such as injuries causing blindness, disabling tremors, and paralysis. Id. at 403, 696 A.2d 619. The Court pointed out, however, that not every objective permanent injury results in a substantial loss of a bodily function.
We are also guided by the Court's recent post-Brooks decision in Gilhooley v. County of Union, 164 N.J. 533, 753 A.2d 1137 (2000), where the plaintiff, who slipped and fell while leaving the Union County Jail, brought a negligence action against the County and its Sheriff's Department. Following oral argument, the Law Division granted summary judgment in favor of the defendants. Id. at 537, 753 A.2d 1137. The court determined that the plaintiff's scar did not constitute a permanent disfigurement. Id. at 538, 753 A.2d 1137. The Appellate Division affirmed the trial court's grant of summary judgment. Although the trial court had omitted consideration of the plaintiff's claim that her knee injury constituted the permanent loss of a bodily function, the Appellate Division determined that the objective medical evidence presented in the record did not support such a claim. Id. The Appellate Division determined that the plaintiff suffered only a temporary loss of bodily function, evidenced by the fact that she was fully capable of returning to work, sought no further treatment for her injuries and was taking no medication for her condition. Id.
The Supreme Court granted certification and Justice Long, writing for the Court, held that the reconstructed knee constituted a permanent injury resulting in a substantial loss of bodily function so as to entitle the plaintiff to recover damages for pain and suffering under the Tort Claims Act. Id. at 545-46, 753 A.2d 1137.
In any given case, it is fair to say, speaking in general terms, that the possible range of the weight of evidence on a summary judgment motion is a broad one. At one extreme, for example, and depending on the proofs, the evidence could weigh in favor of the motion's proponent to a compelling degree, to the extent that there would be no genuine issue of fact, so that the proponent of the motion would be entitled to judgment as a matter of law. At the other extreme, the motion's proponent might not be entitled to judgment, and might even be susceptible to the loss of a cross-motion for summary judgment, because the proofs are overwhelming against him. And in some instances, at least, there also could be a gray area between these two extremes, where the evidence is conflicting and neither party is entitled to judgment as a matter of law. When a case is in that gray area, the proponent of the motion has not carried his burden of showing there is no genuine issue of fact and *507 his summary judgment motion should be denied.
On the evidence submitted in this case, and accepting as true all evidence that supports plaintiffs' position and according them the benefit of all legitimate inferences which can be deduced from the evidence, we conclude that the Law Division erred in determining that plaintiff's injuries were not substantial as a matter of law.
Plaintiff's evidence showed that Ponte was seen at St. Clare's Riverside Medical Center later the night of the accident, March 8, 1995, where he was treated and released. While at the hospital, he was diagnosed as having a cervical sprain and a contusion to his right lower leg, but no knee injury was mentioned.
On March 9, 1995, one day after the accident, Ponte came under the care of David Feldman, M.D., an orthopaedic surgeon. On April 19, 1995, approximately five weeks after the accident, Dr. Feldman sent him for an MRI of his right knee. The MRI revealed a small joint effusion and a tear in the posterior horn of the medial meniscus extending to the inferior margin. On April 27, 1995, plaintiff returned to Dr. Feldman with pain in his knee and a positive McMurray sign. Dr. Feldman noted the lack of any improvement in the condition of plaintiff's right knee and scheduled him for surgery.
On June 30, 1995, within four months of the accident, Dr. Feldman performed arthroscopic partial medial menisectomy, partial synovectomy, and chondorplasty of plaintiff's patella at Northwest Covenant Medical Center. During surgery, Dr. Feldman noticed that plaintiff had not only a tear of the medial meniscus with synovitis of the plica band, but also a Grade 2 chondromalacia of his patella.
On July 5, 1995, plaintiff returned to Dr. Feldman and continued under his care on July 13, 1995, August 17, 1995, September 13, 1995, December 11, 1995, January 29, 1996, July 29, 1996, September 22, 1997, October 20, 1997, and September 22, 1999. During these visits, plaintiff had complaints regarding his neck, back and right knee including tenderness, pain, decreased range of motion, difficulty sleeping and sitting, myeofacial trigger points, episodes of his right knee giving way, positive McMurray sign post surgery, stiffness, paresthesias to the lateral thigh, and decreased disc space at L4-5 and L5-S1.
Dr. Feldman's impression the last time he examined plaintiff on September 22, 1999, was:
My impression was that of a probable internal derangement of the knee, despite arthroscopic surgery there can be recurring episodes of chondromalacia patella which may be permanent in nature. The patient still had cervical spondylosis which was still symptomatic at that time and is permanent in nature. His symptoms are that of pain and decreased motion of the cervical spin. The patient still has persistent symptoms of low back pain with thigh radiation which may represent a meralgia paresthetica syndrome or may represent a continued lumbar radiculopathy.
Dr. Feldman concluded that:
In summary, the patient has permanent findings related to the back, the neck and the knee.
Cervical and lumbar spine have had continued symptoms despite conservative treatment and I feel these will be permanent in nature. The knee has had ongoing symptoms and further evaluation can be considered in the future to see if there is any potential change of additional surgeries giving him improvement over time. However, the patient had chondromalacia off the patella and this may progress despite surgical intervention as well. In my opinion, the residuals of the motor vehicle accident have left a permanent loss of bodily function.
Ponte was seen by New Jersey Transit's expert, Dr. Riccardi, on May 5, 1998, who *508 has taken a different view of the injuries. Dr. Riccardi viewed plaintiff's bare foot gait as normal in appearance. According to Dr. Riccardi, plaintiff was able to ambulate his heels and toes and squat down on both knees and to have the same range of motion to both knees, and Dr. Riccardi could not find any instability, effusion, swelling, patella ballottement nor patella femoral crepitus in plaintiff's right knee. Dr. Riccardi concluded that plaintiff had full and excellent mobility in his cervical and lumbosacral spines and did not find any evidence of internal derangement of his right knee. Dr. Riccardi considered plaintiff's prognosis to be excellent and did not find any evidence of a permanent disability related to the motor vehicle accident.
Addressing the particular circumstances of the present case, in our view, there is evidence that Robert Ponte's injuries fall within the contemplation of the Legislature when it enacted the "permanent loss of bodily function" language and fall within the "substantial" requirement as explained in Brooks and Gilhooley. In other words, this case falls into a gray area, as hypothesized in the above discussion, wherein the motion could not be granted as a matter of law because of contested issues of fact. As noted, on March 9, 1995, one day after the accident, plaintiff came under the care of David Feldman, M.D., an orthopaedic surgeon. On April 19, 1995, five weeks after the accident, Dr. Feldman sent plaintiff for an MRI of plaintiff's right knee. The MRI revealed small joint effusion and a tear in the posterior horn of the medical meniscus extending to the inferior margin. Plaintiff returned to Dr. Feldman on April 27, 1995, and in addition to pain in his knee, had positive McMurray sign. Dr. Feldman noted the lack of any improvement of the condition of plaintiff's right knee and scheduled plaintiff for surgery.
In a summary judgment application, the court must assume the truth of the facts presented by the non-moving party, including giving that party the benefit of all favorable inferences that those facts support. Brooks v. Odom, 150 N.J. 395, 398, 696 A.2d 619 (1997); Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995); Strawn v. Canuso, 140 N.J. 43, 48, 657 A.2d 420 (1995).
"To withstand a motion for summary judgment, the non-moving party need only present `competent evidential materials... [which], when viewed in the light most favorable to [that] party, are sufficient to permit a rational factfinder to resolve the alleged dispute in [that party's] favor....'" Hammer v. Township of Livingston, 318 N.J.Super. 298, 310, 723 A.2d 988 (1999) (citing Brill, supra, 142 N.J. at 540, 666 A.2d 146 (alterations in original)).
Here, viewing the evidence in the light most favorable to plaintiff, we are persuaded that the injury to his knee is more than sufficient to present a fact issue that compels denial of the motion with respect to plaintiffs' claim for non-economic losses and to surpass the threshold of the Tort Claims Act, since the record raises a factual dispute concerning plaintiff's claim that his knee injuries are substantial and that he has an enduring, indeed a permanent, loss of bodily function. For purposes of summary judgment, defendants are stymied by the genuine basis presented by the evidence, from which the trier of fact could determine that Ponte's injuries were permanent and substantial, particularly taking into account Ponte's surgery and the objective medical opinion he has put forward. In our view, a reasonable trier of fact, construing the evidence most favorably to plaintiffs, could find that the injuries were substantial and permanent and, that said, defendants did not carry their burden on the motion. To the extent that evidence contrary to plaintiffs' position is also present, the issues of fact need to be resolved at trial by the trier of fact.
The order granting summary judgment against plaintiff is reversed.