791 A.2d 1002

ROBERT PONTE AND PRISCILLA PONTE, PLAINTIFFS–RE-
SPONDENTS, v. RICHARD OVEREEM AND NEW JERSEY
TRANSIT, INC., DEFENDANTS–APPELLANTS.

Argued November 27, 2001—Decided February 27, 2002.

*Jeffrey J. Miller*, Assistant Attorney General, argued the cause for appellants (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Michael J. Haas*, Assistant Attorney General, of counsel; *Karen L. Jordan*, Deputy Attorney General, on the brief).

*James J. Mahoney*, argued the cause for respondents.

PER CURIAM.

In this appeal we consider whether plaintiff, Robert Ponte, may recover for pain and suffering damages under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3. At issue is whether an injury to plaintiff's right knee requiring arthroscopic surgery satisfies the threshold requirement under that Act. *N.J.S.A.* 59:9–2d. The Appellate Division reversed an order granting summary judgment for defendants, holding that plaintiff had raised a factual issue concerning whether his knee injury constituted a "permanent loss of a bodily function that is substantial." *Gilhooley v. County of Union,* 164 *N.J.* 533, 541, 753 *A.*2d 1137 (2000). We now reverse.

I

On March 8, 1995 while driving westbound on the helix leading from the Lincoln Tunnel, plaintiff's car stalled because of an electrical malfunction. There was no shoulder where plaintiff could pull over safely, so his car remained where it stalled in the far right traveling lane. Shortly thereafter, a New Jersey Transit bus traveling in the far right lane rear-ended his car. The impact caused the back of plaintiff's driver's seat to break and his right knee to strike the dashboard.

Following the accident, plaintiff was admitted to the St. Clare Riverside Medical Center complaining primarily of pains in his neck and in his right lower leg. The treating physician diagnosed a cervical sprain and a contusion on his right leg. Plaintiff was discharged from St. Clare on the same night.

On March 9, 1995, the day following the accident, plaintiff came under the care of Dr. David J. Feldman, an orthopedic surgeon. Dr. Feldman's initial examination of plaintiff revealed "marked decreased motion of the cervical spine" and "abrasions and resolving contusions over the right tibia." Knee, hip and ankle examinations were negative, indicating no neurological deficits. Dr. Feldman recommended a soft collar, medication and limited physical therapy.

When Dr. Feldman saw plaintiff on April 13, 1995, plaintiff complained primarily of stiffness in his neck and pain in his back. However, plaintiff also complained of some locking and clicking in his right knee and pain in the medial area, the side of the knee closest to the other knee. He also had positive responses to pain tests. Dr. Feldman determined that the "right knee had signs of internal derangement" and there was probably a tear of the meniscus.[1] He recommended continuation of the exercise program and medication.

On April 19, 1995, plaintiff had an MRI that revealed a small joint effusion and a small tear in the posterior horn of the medial meniscus. The MRI additionally revealed that the medial and lateral collateral ligaments were intact, as were the quadriceps tendon and the patellar ligament. The posterior and cruciate ligaments also were intact.

Plaintiff was again reevaluated on April 27, 1995 when he complained of ongoing pain in the right knee. At that time, Dr. Feldman indicated that plaintiff had "increasing symptoms with activities." Based on those increased symptoms and lack of improvement, Dr. Feldman recommended arthroscopic surgery on the right knee.

---

[1] The meniscus is a "firm, rubbery type of cartilage" between the thigh and shin bone in the knee. It acts as a shock absorber and "provides some stability to the knee." *Meniscal Tears,* <http://www.med.virginia.edu/medicine/clinical/orthopaedics/ menisc.html.> (visited January 24, 2002).

On June 25, 1995, plaintiff again was admitted to St. Clare after he fell over his handlebars while riding his mountain bike. During that admission to St. Clare, plaintiff complained of back and groin pain.

On June 30, 1995, less than one week after his biking accident, plaintiff underwent arthroscopic partial medial menisectomy, partial synovectomy and chondroplasty of the patella in the right knee. The purpose of the surgery was to repair the small tear of the medial meniscus and treat the synovitis of the plica band and the Grade 2 chondromalacia of the patella. In his post-operative report, Dr. Feldman noted that plaintiff had "tolerated the procedure well." Plaintiff saw Dr. Feldman for a post-operative visit on July 5, 1995. Dr. Feldman noted that plaintiff was "doing well" and that the "[k]nee motion was almost full with minimal pain."

Dr. Feldman reevaluated plaintiff on August 17, 1995 and indicated that the knee had only "slight tenderness." He also noted that plaintiff again was exercising and had returned to work. Plaintiff saw Dr. Feldman on September 13, 1995 after he experienced some pain in the medial side of the knee while squatting and putting on a bicycle tire. Dr. Feldman determined that there was still some tenderness but that there was no instability or swelling. Plaintiff also had negative responses to pain tests. Dr. Feldman diagnosed medial collateral ligament strain and mild hamstring tendonitis, and prescribed local injection and anti-inflammatory medication.

Plaintiff next saw Dr. Feldman on December 11, 1995, complaining of ongoing pain in his right knee. Dr. Feldman prescribed local injections, stretching, ice, and anti-inflammatory medication. Dr. Feldman saw plaintiff again on January 29, 1996 and noted that plaintiff had improved. Specifically, Dr. Feldman noted that the "knee had done well with minimal tenderness noted [and] slight medial joint line pain." Plaintiff's primary and ongoing complaint on that date concerned his neck.

On July 29, 1996, Dr. Feldman noted that plaintiff's "knee had good motion ... with occasional pain in the medial side ...

associated with flexion." Dr. Feldman then discharged plaintiff to be seen only on an "as needed" basis. He next saw plaintiff on October 20, 1997, at which time plaintiff complained of neck and buttock pain. Dr. Feldman also indicated that "[d]eep tendon reflexes and motor sensory examination[s]" were negative.

Dr. Feldman's notes indicate that following the visit on October 20, 1997, plaintiff did not return for almost two years until his last visit on September 22, 1999. Dr. Feldman's notes relating to that visit state that since the surgery in 1997 plaintiff "had had one or two episodes of the right knee giving way." An examination of the knee showed some tenderness in the medial compartment. Plaintiff also had positive responses to pain tests. Dr. Feldman observed that there was good range of motion and good stability. Plaintiff continued to complain of back and neck pain and also complained of a tingling sensation in the lateral thigh. X-rays of the knee showed that there was no specific bony lesion. Standing films showed maintenance of the joint space without any obvious significant arthritis.

Dr. Feldman's final assessment concerning plaintiff's knee stated that plaintiff had sustained

> probable internal derangement of the knee, despite arthroscopic surgery [and] there can be recurring episodes of chondromalacia patella[,] which may be permanent in nature.
>
> ... The knee has had ongoing symptoms and further evaluation can be considered in the future to see if there is any potential [chance] of additional surgeries giving him improvement over time. However, the patient had chondromalacia of the patella and this may progress despite surgical intervention as well. In my opinion, the residuals of the motor vehicle accident have left a permanent loss of bodily function.

On May 5, 1998, almost three years after his surgery, plaintiff visited Dr. Ralph E. Ricciardi, defendants' orthopedic expert. At that time, plaintiff told Dr. Ricciardi that his primary complaint was his neck and back and that he had no complaints regarding his right knee. Dr. Ricciardi indicated that the "[r]ange of motion of the right knee was 0 [degrees] of extension to 135 [degrees] of flexion." He noted further that the range of motion of the left knee was the same as the right knee. He also stated that "[t]here

was no muscular spasticity or bony deformity present in the right knee." Dr. Ricciardi further observed that plaintiff's gait was normal, there was no evidence of any internal derangement in the right knee, and plaintiff was able to ambulate and squat without difficulty.

Answers to interrogatories submitted by plaintiff indicate that before the accident he was an avid biker and often biked three to four times per week. Following the accident, plaintiff was unable to bike at all for approximately six months and then only infrequently for approximately one year after the accident. Plaintiff also lifted weights two to three times per week prior to the accident. After the accident, he was unable to lift weights at all for approximately six months and then only sporadically for approximately one year after the accident. Plaintiff also contended that he was unable to do household chores and yard work for several months after the accident and was restricted in performing those activities for sometime thereafter. Plaintiff further indicated that he was unable to sit for more than ten minutes without pain and that his sleep was disturbed each night by pain. Those complaints of pain, however, appear to be related to his neck and back only.

In January 1997, plaintiff and his wife, Priscilla, instituted a suit in the Law Division against defendants. After summary judgment was granted in favor of defendants, plaintiff and his wife appealed.

The Appellate Division reversed the trial court's determination that plaintiff had not presented a factual issue concerning the threshold requirement under the Tort Claims Act. *Ponte v. Overeem*, 337 *N.J.Super.* 425, 435, 767 *A.*2d 503 (App.Div.2001). The court reviewed our decisions in *Brooks v. Odom*, 150 *N.J.* 395, 402–04, 696 *A.*2d 619 (1997), and *Gilhooley*, supra, 164 *N.J.* at 541, 753 *A.*2d 1137, where we stated that in order to recover for pain and suffering damages under the Tort Claims Act a plaintiff must show an objective permanent injury and a "permanent loss of a bodily function that is substantial." The court observed that on a motion for summary judgment "the evidence could weigh in favor

of the motion's proponent to a compelling degree, to the extent that there would be no genuine issue of fact, so that the proponent of the motion would be entitled to judgment as a matter of law." *Ponte, supra,* 337 *N.J.Super.* at 431, 767 A.2d 503 . On the other hand, "the motion's proponent might not be entitled to judgment, and might even be susceptible to the loss of a cross-motion for summary judgment, because the proofs are overwhelming against him." *Ibid.*

The court further noted that in some instances, "there also could be a grey area between these two extremes, where the evidence is conflicting and neither party is entitled to judgment as a matter of law." *Ibid.* It concluded that when a case falls into this grey area, summary judgment should be denied because the "proponent of the motion has not carried his burden of showing there is no genuine issue of fact." *Ibid.* In construing the evidence most favorably to plaintiff, the court concluded that plaintiff's case fell into that grey area. *Id.* at 434, 743 A.2d 872. Hence, the court reversed the order granting summary judgment to defendants, finding that plaintiff had presented a triable issue of fact concerning whether his knee injury constituted a permanent loss of a bodily function that was substantial. *Id.* at 435, 743 A.2d 872. This Court granted defendants' petition for certification. 168 *N.J.* 293, 773 A.2d 1156.

## II

In *Kahrar v. Borough of Wallington,* 171 *N.J.* 3, 791 A.2d 197 (2002), also decided today, we considered whether the plaintiff, who had torn her rotator cuff, could recover pain and suffering damages under the Tort Claims Act. There, the plaintiff had tripped on an improperly sealed water valve box located in the street. The plaintiff suffered a massive tear to her rotator cuff requiring invasive surgery that resulted in the shortening of the length of the reattached tendon. After surgery, the plaintiff continued to complain of pain in the injured shoulder. Her doctor also noted a significant decrease in the range of motion in her left

shoulder and arm. Notably, the doctor observed that the plaintiff's forward flexion measured 120 degrees compared with 170 degrees for the right arm, and that the plaintiff's ability to externally rotate the left arm while abducted measured forty five-degrees compared with eighty degrees for the right arm. In addition, the plaintiff's "ability to extend her arm behind her back was compromised because she was able to reach only the second of the five lumbar vertebra (lower back) with her left hand, but could extend her right arm higher to reach the eighth of the twelve thoracic vertebra (mid back)." *Kahrar, supra,* 171 *N.J.* at 7, 791 *A.*2d 197. We noted also that the defendant's own doctor had concluded that the plaintiff sustained a forty percent loss of full motion in her left shoulder.

We considered the plaintiff's substantial medical bills of approximately $25,000, her lost wages and the fact that she missed approximately one hundred days of work. In addition, we acknowledged that the plaintiff's injury affected her ability to complete her normal work responsibilities and to perform all of her regular household tasks. We also considered the difficulty that the plaintiff experiences while driving, sleeping through the night, reaching certain areas of her body and continuing her hobbies. *Id.* at 8-9, 791 *A.*2d 197.

The Court observed in *Kahrar* that it is the nature or degree of the ongoing impairment that determines whether a specific injury meets the threshold requirement under the Tort Claims Act. Thus, there is no *per se* rule that would preclude finding a permanent and substantial loss of a bodily function merely because a claimant still is able to function reasonably well at work and at home, irrespective of the nature or degree of the impairment. Based on that standard, we held that the "plaintiff has adequately demonstrated a permanent and substantial loss of a bodily function." *Kahrar, supra,* 171 *N.J.* at 16, 791 *A.*2d 197.

In applying that standard, we find that this plaintiff has not satisfied the threshold for recovering pain and suffering damages under the Tort Claims Act. For reasons not entirely clear from the

record, plaintiff was never deposed. Thus, the plaintiff's evidence consists only of answers to interrogatories and numerous medical reports. Noticeably absent from the record, however, is any evidence that plaintiff's range of motion is limited, his gait impaired or his ability to ambulate restricted. Plaintiff also has not demonstrated that there is any permanent instability in the knee, citing only the one or two instances of his knee "giving way" since his surgery in 1995. The record also does not support that plaintiff currently is restricted because of his knee in performing his work responsibilities, household chores, yard work, or in his weightlifting or biking activities. Unlike the plaintiff in *Kahrar* whose reattached tendon was shortened by the surgical repair of her rotator cuff and who sustained a forty-percent restriction in motion, plaintiff has not demonstrated any physical manifestation of his claim that the injury to his knee is permanent and substantial. In sum, plaintiff's allegations concerning the injury to his knee do not establish a loss of normal bodily function that is both permanent and substantial, but merely "iterates a claim for pain and suffering." *Brooks, supra,* 150 *N.J.* at 403, 696 *A.*2d 619 (citations omitted). In our view, this record does not present a material issue of fact about whether plaintiff's knee injury constitutes a permanent loss of a bodily function that is substantial.

### III

We reverse the judgment of the Appellate Division and reinstate the summary judgment in favor of defendants granted by the Law Division.

VERNIERO, LaVECCHIA, JJ., concurring.

We concur in the disposition of the Court solely on the basis that it complies with the standard articulated in *Brooks v. Odom,* 150 *N.J.* 395, 696 *A.*2d 619 (1997). For the reasons expressed in the dissenting opinion in *Kahrar v. Borough of Wallington,* 171 *N.J.* 3, 16, 791 *A.*2d 197 (2002) (Verniero, J., dissenting), we believe that the *Brooks* standard is the appropriate one to be used

when evaluating claims for non-economic damages against a public entity under the Tort Claims Act.

For reversal and reinstatement—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG and ZAZZALI—5.

*For concurrence*—Justices VERNIERO and LaVECCHIA—2.

*Opposed*—None.