797 A.2d 878 (2002)
351 N.J. Super. 186
Megan M. NEWSHAM, Plaintiff/Appellant,
v.
CUMBERLAND REGIONAL HIGH SCHOOL, Anne Gallaccio, Sherri Kernan, and Thomas Becker, Defendants/Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 2002.
Decided May 23, 2002.
Mati Jarve, Cherry Hill, argued the cause for appellant (Garber, Kasten, Jarve & Mullen, attorneys; Mr. Jarve, on the brief).
Stephen G. Sobocinski, Marlton, argued the cause for respondents (Tucker & Munyon, attorneys; Mr. Sobocinski, on the brief).
*879 Before Judges SKILLMAN, WALLACE, and WELLS.[1]
The opinion of the court was delivered by WALLACE, J.A.D.
Plaintiff appeals from a grant of summary judgment dismissing her personal injury complaint against Cumberland Regional High School District and its employees. We agree with the motion judge that plaintiff did not satisfy the requirements of the New Jersey Tort Claims Act, N.J.S.A. 59:9-2(d), and affirm.
Viewing the evidence in the record in the light most favorable to plaintiff, as we must, see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), the record established the following facts. On November 14, 1994, plaintiff, a then fourteen-year old high school cheerleader, was injured while performing a "pyramid" stunt. Plaintiff fell from the top of the pyramid to the gymnasium floor. She was taken to South Jersey Hospital on the same day where X-rays revealed a compression fracture at the T7 vertebra. Plaintiff came under the care of Dr. Seth M. Silver, an orthopedic surgeon, who ordered physical therapy and scheduled visits periodically. Following a March 15, 1995 evaluation, Dr. Silver informed plaintiff to return in six months for X-rays, but that she need not limit her activity in any way.
Plaintiff also visited Alfred I. duPont Institute (DuPont Institute) shortly after the accident in November 1994. She informed the doctor that her back pain did not keep her up at night and that she did not limit her daily activities. The doctor instructed plaintiff not to perform cheer-leading or heavy lifting for a few weeks. About two years later, plaintiff was again evaluated at the DuPont Institute. She had no neurologic complaints at that time, but did have intermittent back pain. She reported no night pain. The August 6, 1996 report from DuPont Institute indicated that the radiographs showed "a mild 10 degree lumbar scoliosis and evidence of well-healed compression fracture at the level of T7 with no residual kyphotic deformity at the injury level."
Plaintiff next visited DuPont Institute on August 7, 1997. She complained of intermittent pain in her back, which was relieved by Motrin, and denied any new symptoms. In the report, Dr. Jayakumar opined that plaintiff was doing relatively well, and ordered physical therapy for back and scapular strengthening. Dr. Jayakumar did not think plaintiff's scoliosis was related to her fall.
Plaintiff again visited DuPont Institute on June 15, 1998. In the report, DuPont summarized the prior evaluations and noted that plaintiff "has done fairly well from her compression fracture," which resulted from the November 1994 fall.
In October 1998, plaintiff visited Dr. Barry Gleimer, D.O., an orthopedic surgeon. Dr. Gleimer diagnosed plaintiff with a T7 compression fracture and scoliosis. He was uncertain about the cause of the scoliosis. Plaintiff was again evaluated by Dr. Gleimer on January 13, 1999. In his report, Dr. Gleimer opined that plaintiff would develop degenerative arthritis in her thoracic spine due to the trauma and that she has "a significant limitation of intersegmental motion at this area consistent with her injury and scarification about this injury." Plaintiff also visited Dr. *880 Gleimer on April 12, 1999, and he found that her condition was unchanged.
In February 1999, plaintiff was evaluated by Dr. Rosemary Calio, D.C., a chiropractor. At that time, plaintiff's primary complaint was pain in her mid-back region. In her September 13, 2000 report, Dr. Calio reviewed plaintiff's medical history following her November 1994 accident, diagnosed plaintiff with a cervical strain and sprain, and noted that:
[T]he patient demonstrated improvement in motion and a decrease in upper, mid and lower back pain with treatment. However, due to the nature of this injury and the structural changes that resulted, treatment will not be curative, and she will be prone to exacerbations depending upon her level of activity. Ms. Newsham has suffered a compression (0%-25%) of one vertebral body associated with recurring pain of a chronic nature. This is considered a permanent impairment. Structure affects function. Even subtle changes can alter functionality over time making this patient significantly more vulnerable to post traumatic arthritic changes of the spine. With regard to the thoracic spine, the area of her fracture, an abnormal curvature or scoliosis is also present resulting in a hump on the right of the spine due to posterior protrusion of the rib and shoulder blade. This area of abnormal curvature is not addressed by the physicians at the DuPont Center.
Dr. Calio opined that plaintiff's injuries were permanent and resulted from her fall on November 14, 1994.
In Dr. Calio's subsequent report, dated February 1, 2001, she noted that plaintiff was diagnosed with scoliosis following her accident, which was secondary to the trauma of November 14, 1994. Dr. Calio opined that, based on the subjective complaints of plaintiff and the objective positive tests and studies, plaintiff suffered a significant, permanent impairment of the neuromusculoskeletal system as a direct result of the fall and resultant spinal fracture.
At her deposition in December 2000, plaintiff indicated she was an excellent student. She was then taking eighteen credits in college and working 20-25 hours a week as a bartender and waitress. She recalled that she engaged in some cheerleading a few months after the accident, but stopped that activity after the end of the school year. She participated in gym classes in her freshman through senior years of high school, but she no longer engaged in contact sports. She testified that after completing her first semester at college, she abandoned her original plans to become a physical therapist because of the lifting requirements for that profession. She traveled on vacation trips with her family to New England in 1998 and 1999, and went kayaking for the first time in Maine in 1998. Plaintiff testified she is able to clean her room.
In her certification in opposition to defendant's motion for summary judgment, plaintiff certified that since the accident she cannot sit to draw or paint for longer than forty-five minutes without experiencing pain, she cannot lift anything over a minimal weight when she exercises, and she cannot keep up with her friends to enjoy bike riding, swimming, tennis or rollerblading. Further, she explained that she cannot do certain tasks on her job as a bartender, such as lifting supplies to stock the bar, and she must take medicine and frequent breaks to complete her eight-hour work shift.
In granting defendant's motion for summary judgment, the judge first concluded that there is objective evidence of a permanent injury as a result of plaintiff's T7 compression fracture. In addressing *881 whether plaintiff demonstrated a permanent loss of bodily function that is substantial, the judge noted that plaintiff was able to perform well in school, and work while attending school. The judge concluded that plaintiff's injury and limitations were similar to those in Brooks v. Odom, 150 N.J. 395, 696 A.2d 619 (1997), and granted defendants' motion. This appeal followed.
The Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 (the Act), limits the availability of tort recoveries from public entities for non-economic loss. The Act provides in pertinent part:
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.[2]
[N.J.S.A. 59:9-2d.]
In Brooks, supra, 150 N.J. at 400, 696 A.2d 619, plaintiff suffered a variety of neck and back injuries that caused her to suffer severe pain and limited range of motion. Although she underwent extensive physical therapy and other treatment, her doctor concluded that she had "significant and permanent loss of function with chronic pain that was exacerbated by the usual activities of daily living." Ibid. The Court held that in order for a claimant to recover under the Act, the claimant must present objective medical evidence of permanent injury and a permanent loss of a bodily function that is substantial. Id. at 406, 696 A.2d 619. After noting that plaintiff experienced pain, that the limitation of motion in her neck and back was permanent, and that she could still function in her employment as a homemaker, the Court concluded that plaintiff failed to suffer a "permanent loss of a bodily function within the contemplation of the Tort Claims Act." Id. at 406, 696 A.2d 619. Cf. Hammer v. Township of Livingston, 318 N.J.Super. 298, 306, 723 A.2d 988 (App. Div.1999) (concluding that plaintiff failed to demonstrate permanent loss of a bodily function because her subjective complaints of pain were not supported by objective medical evidence). But see Gerber v. Springfield Bd. of Educ., 328 N.J.Super. 24, 36, 744 A.2d 670 (App.Div.2000) (holding that summary judgment was improperly granted to defendants where minor plaintiff's nose was injured in school by another student and that injury caused her to have "permanent and constant difficulty breathing").
In Gilhooley v. County of Union, 164 N.J. 533, 753 A.2d 1137 (2000), the Court again explored the parameters of the requirement of "permanent loss of a bodily function" necessary to meet the threshold under the Act. There, plaintiff suffered a fractured nose and injured her right knee. The knee injury resulted in complete loss of quadriceps power which prohibited stair climbing, chair ascent and descent, and efficient walking. Id. at 536, 753 A.2d 1137. Plaintiff underwent an open reduction internal fixation requiring two K-wires or pins and an AO tension band wire in her knee. Ibid. The surgical procedure, which resulted in a significant scar, allowed plaintiff to return to work but resulted in constant stiffness and pain in her knee. Id. at 537, 753 A.2d 1137. After reviewing the standard established in Brooks, the Court concluded:
We are satisfied that the Legislature intended to include within the notion of *882 aggravated cases those involving permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function. As is the case with dismemberment and disfigurement, when pins, wires, mechanisms and devices are required to make the plaintiff normal, the statutory standard is met. The fact that a physician has jury-rigged the knee to function with pins and wires in no way inhibits the characterization of that injury as the permanent loss of a bodily function. The same would be true of a plaintiff whose vision is restored with a lens, one whose hearing is restored with a hearing aid, and one whose heart is operating efficiently with a pacemaker or implanted valve. We conclude that those are all aggravated cases within the contemplation of the Legislature when it enacted the `permanent loss of bodily function' language and that they fall squarely within the `substantial' requirement of Brooks. Accordingly, the knee injury vaulted Mrs. Gilhooley over the pain and suffering threshold of N.J.S.A. 59:9-2(d).
[Id. at 542-43, 753 A.2d 1137.]
Recently, and subsequent to the motion judge's decision in this case, our Supreme Court decided Kahrar v. Borough of Wallington, 171 N.J. 3, 791 A.2d 197 (2002), and Ponte v. Overeem, 171 N.J. 46, 791 A.2d 1002 (2002). The Court again explored the parameters of the standard of "permanent loss of a bodily function" necessary to meet the threshold under the Act, and amplified the Brooks standard.
In Kahrar, plaintiff suffered a massive tear to her left arm rotator cuff in an alleged fall in a pothole in a road owned and maintained by the Borough of Wallington. Kahrar, supra, 171 N.J. at 6, 791 A.2d 197. Following surgery to repair the tear, plaintiff's doctor noted improvement. Plaintiff received physical therapy for about nine months after the surgery. Plaintiff's doctor's last report, rendered 227 days after surgery, described plaintiff's range of motion in her left arm as measuring less than that in her right arm. A subsequent defense exam confirmed that plaintiff sustained substantial loss of motion in her left arm as a result of the rotator cuff tear. Id. at 7-8, 791 A.2d 197. Plaintiff returned to work as a secretary two months after her surgery. She indicated it took her longer to complete some of her duties, and she needed assistance for others. In addition, plaintiff asserted she experienced difficulty in performing normal household tasks, sleeping through the night without pain, reaching certain areas of her body, continuing her hobbies and driving her car. In reviewing the Brooks standard, the Court explained:
[t]he Brooks holding demonstrates that distinctions between sedentary and non-sedentary plaintiffs in applying the Tort Claims Act standard are inappropriate. Rather, the appropriate focus is on the degree of injury and impairment. Moreover, dicta in Brooks should not be understood to suggest that plaintiffs with permanent and substantial impairments who, nevertheless, can manage to perform adequately routine tasks at work and at home are barred from recovery. If the loss of bodily function is permanent and substantial, as in this case, a plaintiff's eligibility to recover pain and suffering damages will not be defeated merely because she can perform some routine functions almost as well as she could prior to her injury.
[Id. at 14-15, 791 A.2d 197.]
The Court concluded that plaintiff's injury was similar to the injury in Gilhooley, since plaintiff had surgery to repair "a massive tear" of the rotator cuff, and that, *883 despite the success of the surgery, "plaintiff's ability to complete normal tasks has been significantly impaired because plaintiff has lost approximately forty percent of the normal range of motion in her left arm." Id. at 15-16, 791 A.2d 197.
In Ponte, supra, 171 N.J. at 47, 791 A.2d 1002, plaintiff was injured in March 1995, when his car was struck by a New Jersey Transit bus. Plaintiff complained of pain in his neck and right lower leg. An MRI revealed a small joint effusion and a small tear in the posterior horn of the medial meniscus of his right knee. Plaintiff continued to have pain in his right knee, which increased with activity. Id. at 48, 791 A.2d 1002. In June 1995, plaintiff had arthroscopic surgery on his right knee. He improved but still complained of pain and tenderness in that area. In the final evaluation of plaintiff, his doctor opined that plaintiff sustained a probable derangement of his right knee, had ongoing symptoms, and the accident caused plaintiff to have a permanent loss of bodily function. Id. at 50, 791 A.2d 1002. Although plaintiff complained of certain limitations in his right knee while attempting to exercise or perform housework, he was not deposed and there was no other evidence in the record indicating that the injury to his knee was permanent and substantial.
In May 1998, plaintiff was examined by defendant's doctor and denied any complaints regarding his knee. The doctor reported that plaintiff's range of motion was the same in both knees, his gait was normal, there was no evidence of any internal derangement in the right knee, and plaintiff was able to ambulate and squat without difficulty. Based on these facts, the Court found that plaintiff failed to meet the threshold for recovering pain and suffering damages under the Act, noting:
[There is no] evidence that plaintiff's range of motion is limited, his gait impaired or his ability to ambulate restricted. Plaintiff also has not demonstrated that there is any permanent instability in the knee, citing only the one or two instances of his knee `giving way' since his surgery in 1995. The record also does not support that plaintiff currently is restricted because of his knee in performing his work responsibilities, household chores, yard work, or in his weightlifting or biking activities. Unlike the plaintiff in Kahrar whose reattached tendon was shortened by the surgical repair of her rotator cuff and who sustained a forty-percent restriction in motion, plaintiff has not demonstrated any physical manifestation of his claim that the injury to his knee is permanent and substantial. In sum, plaintiff's allegations concerning the injury to his knee do not establish a loss of normal bodily function that is both permanent and substantial, but merely `iterates a claim for pain and suffering.' Brooks, supra, 150 N.J. at 403, 696 A.2d 619 (citations omitted). In our view, this record does not present a material issue of fact about whether plaintiff's knee injury constitutes a permanent loss of a bodily function that is substantial.
[Id. at 53-54, 791 A.2d 1002.]
Our reading of Brooks, Gilhooley, Kahrar, and Ponte leads us to conclude that the underlying principles set forth in Brooks still control. Gilhooley extends the class of injuries covered by the Brooks standard to include those functions which have been restored through the use of permanent pins and wires, without which plaintiff could not function. In other words, this class of cases "is within the notion of aggravated cases involving permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function." Gilhooley, *884 supra, 164 N.J. at 542, 753 A.2d 1137. Kahrar was similar to Gilhooley, where despite successful surgery to repair a rotator cuff tear, plaintiff's loss of approximately forty percent of the normal range of motion in her arm was both permanent and substantial. Kahrar, supra, 171 N.J. at 15-16, 791 A.2d 197. Ponte, on the other hand, was closer to Brooks, in that after knee surgery, plaintiff failed to "demonstrate any physical manifestation of his claim that the injury to his knee was permanent and substantial." Ponte, supra, 171 N.J. at 53-54, 791 A.2d 1002. Thus, the Court equated Ponte's claims essentially to a claim for pain and suffering which failed to meet the Brooks standard.
In our view, plaintiff's condition here is analogous to that described in Brooks and Ponte. Even accepting plaintiff's description of her condition that her T7 fracture is a permanent injury, "it is the nature or degree of the ongoing treatment that determines whether a specific injury meets the threshold requirement under the Tort Claims Act." Ponte, supra, 171 N.J. at 53, 791 A.2d 1002. Although plaintiff continued to experience some pain and discomfort, the limitations on her activities are minor. She returned to cheerleading during the year of her injury, but decided to discontinue cheerleading after that year. There was no evidence that her treating physician instructed her not to compete in cheerleading. Moreover, unlike in Gilhooley, there was no surgical procedure or insertion of pins and wires. Plaintiff was able to perform well in the classroom, with minor restriction in her physical activities. While successfully taking at least eighteen credits of college courses she worked as a waitress and bartender. Although plaintiff restricted her weight lifting and her participation in contact sports, she completed her physical education classes in high school and college. Moreover, she exercised on a regular basis and performed cardiovascular exercises. While at Rowan University she was able to walk and jog on the treadmill and to use the stepper and elliptical machines. In short, plaintiff's activities demonstrate that while she has some limitations, she did not suffer a permanent loss of a bodily function that is substantial.
To be sure, we are sympathetic to plaintiff's injuries and her discomfort. However, in order to recover under the Act, plaintiff's impairments must be permanent and substantial. We agree with the trial judge's assessment of plaintiff's injuries and affirm the grant of summary judgment in favor of defendants.
Affirmed.
NOTES
[1] Judge Wells did not participate in oral argument, but with the consent of counsel has been added to this panel deciding the matter.
[2] Subsequent to plaintiff's fall and her filing of a Complaint, the Statute was amended, effective September 21, 2000, to increase the medical expense limit to $3,600.00.