**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0131-22

WILLIAM E. COFFEY, III,

    Plaintiff-Appellant,

v.

46 4th STREET, LLC,

    Defendant,

and

BOROUGH OF KEANSBURG
and BOROUGH OF KEANSBURG
WATER AND SEWER
DEPARTMENT,

    Defendants-Respondents.

_____

> Argued September 28, 2023 – Decided December 6, 2023
>
> Before Judges Gummer and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3459-19.
>
> Mark F. Casazza argued the cause for appellant

(Rudnick, Addonizio, Pappa & Casazza, attorneys;
Mark F. Casazza and Greg S. Gargulinski, of counsel
and on the brief).

Thomas A. Schoendorf argued the cause for
respondents (Rainone Coughlin Minchello, LLC,
attorneys; Thomas A. Schoendorf, on the brief).

PER CURIAM

In this personal-injury matter, plaintiff William E. Coffey appeals from the entry of summary judgment dismissing his complaint against defendants, the Borough of Keansburg and the Borough of Keansburg Water and Sewer Department (collectively "Borough"), arguing the motion judge erred in finding plaintiff had failed to show the Borough had notice of a dangerous condition existing on the property and plaintiff's injuries were permanent and substantial. Because we agree summary judgment was properly granted, we affirm.

Plaintiff is a general contractor. On July 18, 2018, plaintiff was at 27 Gillette Street, Keansburg (the property), supervising a home renovation project on behalf of his son's and nephew's company, defendant 46 4th Street, LLC, which owned the property. According to plaintiff, after he arrived at the property in the afternoon, he parked his truck along the curb and exited the truck, intending to walk towards the house located at the property. However, he then fell into a hole surrounding the property's water meter, injuring his left knee and

2

ankle. On July 21, 2018, plaintiff sought medical attention at a local hospital and was referred to an orthopedic specialist for follow-up.

Five days post-accident, plaintiff's employee contacted the Borough to file a complaint about the condition of the water meter pit and requested that repairs be made. The Borough issued a work order and began repairs on the water meter pit the same day. The next day, the Borough completed the repairs, replacing a frame in the water meter pit, installing a riser to raise the pit to ground level, and filling in the area around the water meter.

On July 23, 2018, plaintiff filed a police report about missing tools from the property, though he did not report the injury at that time. The next day, plaintiff filed a subsequent police report wherein he completed an affidavit stating the following:

> July 18th around 3pm(ish) I stepped out of my truck and fell into a hole on the corner of the property on [G]illette [S]treet the grass was covering the water meter and hole which [was] ap[prox]imately [sixteen] inches deep and [two feet wide] the grass was covering the [e]ntire [sic] hole which [he] fell in. Saturday 21st I went to the hospital around 12:15pm[,] they took X-Rays and sent me too [sic] another Dr[.] in [M]iddletown (orthopedic Dr[.]) and the X-Rays showed two chips in my knee (left leg) (left ankle) [d]isplaced.

A-0131-22

In the police report, the reporting officer noted that "while speaking with [plaintiff] on [July 23, 2018,] he did not have any complaints of pain and appeared to be walking normal[ly]."

On September 30, 2019, plaintiff filed a two-count complaint against 46 4th Street, LLC and the Borough, alleging negligence and seeking monetary damages. The Borough filed its answer asserting defenses, including immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 (the TCA), and a period of discovery ensued with plaintiff and the Borough each taking depositions, and retaining liability and medical expert witnesses.

During his deposition, plaintiff testified that "when he got out of the truck it just looked like it was just flat ground and just grass[,]" but the "water meter was set down" below the ground, and "there was a hole around it" with "grass growing out of the hole and around the meter." Plaintiff claimed he had measured the hole after the incident and that it was approximately "sixteen inches deep and about two feet wide."

Steve Ussman, Superintendent of Water and Sewer for the Borough, testified during his deposition that the water meter at the property had been installed "back in the late [eighties] by an outside contractor." He indicated that once a water meter is installed, the Borough is responsible for performing

quarterly readings by "physically go[ing] to the meter and read[ing] it, and unless there [is] an issue with the meter, [they] do [not] do anything there."

He maintained that the Borough had performed the quarterly water meter readings, the last one occurring approximately six weeks prior to the July 18, 2018 accident.[1]  Ussman described the Borough's process for addressing issues with the meters and testified that "shut-off or turn-on" requests and repair requests generate work orders, which are maintained by the Borough.  He further offered that a common issue requiring defendant to perform work on a water meter or surrounding area would be "if the meter [itself] leaked" or if the Borough caused damage to the surrounding area.  He testified that homeowners are not authorized to touch the meter itself but are required to repair any damage they cause and are responsible for general maintenance around the water meter, such as removing "grass, weeds[,] and other debris [is] covering the meter."

Ussman recalled that plaintiff's construction company had been performing renovation work at the property in 2018, and he noted—referring to other interactions with plaintiff on other properties—that plaintiff "has a history of accessing water meter pits without authorization, restoring water to various

---

[1]  Though Ussman testified as to when the last reading would have occurred, there is no record or other evidence indicating that the Borough in fact performed a quarterly reading during the first week of June 2018.

properties without the Borough's knowledge" and "damaging water meters through his unauthorized access of water meter pits."[2]

In responding to questions about the water meter at issue, Ussman was unequivocal in his testimony that there were no prior reports, complaints, or work orders requesting repairs on the property prior to July 23, 2018. He testified that he was, therefore, unaware of any reason his department would have been responsible for "backfilling"[3] the area, considering plaintiff or the property owner had filed no complaints. Ussman reiterated on redirect examination that there were only two reports made by the property owner about any damage to the meter pit at the property; the first was on July 23, 2018, and the second was on September 13, 2018, both post-accident. He further testified that he did not know how long the condition—sunken area or hole—existed at the property. Ussman also indicated that the post-accident inspection of the property revealed that the frame of the water meter pit appeared to have been crushed from being run over by a vehicle and, thereafter, the Borough "fixed the frame and the ring and they leveled it."

---

[3] The parties use the term "backfill" throughout their papers and testimony. We understand "backfill" to mean repairs to the area surrounding the water meter pit to ensure the grade of the area is level with the surrounding ground.

Ussman also testified that there had been no work performed by the Borough in 2017 or 2018 that would have required backfilling the water meter pit. According to Ussman, the Borough "touched" the water meter at least seven times between July 26, 2017, and July 18, 2018, to perform various tasks, including: on July 26, 2017, a Borough engineer inspected the property prior to issuing a certification of occupancy, which showed no structural damage to the property's curb, sidewalk, or driveway; on October 20, 2017, the Borough inspected the water meter to confirm the property owners properly cut and capped the water and sewer lines; on November 28, 2017, the Borough replaced the water meter at the property, which was followed by another inspection on December 13, 2017; on December 28, 2017, the Borough received a request from the property owner to shut off the water service to the property due to an alleged water leak but did not perform any work on the water meter at that time; on March 6, 2018, the Borough again inspected the water meter; and on April 2, 2018, the Borough performed its quarterly reading where no damage was found. Finally, Ussman averred that—though it was undocumented—approximately one month prior to the accident in the first week of June 2018, the Borough had performed the next quarterly reading of the water meter.

A-0131-22

Ussman testified that the completed work orders generated from each of these inspections or quarterly readings did not include any reports of damage to the water meter or surrounding area that would have required backfilling or otherwise repairing the water meter pit. He also described the process whereby water meters are read, stating:

> [w]hen members of the Water and Sewer Department go out to check the meter, . . . they don't necessarily check the actual meter. There is a censor on the cover that they actually touch with a piece of equipment that reads the meter, but if the meter pit itself is damaged or below ground or, you know, if they see any issue with it, they can make notes in their equipment at that time. . . .

Both parties retained liability experts. Plaintiff's liability expert, Wayne F. Nolte, Ph.D., P.E., opined that the water meter pit was depressed, about four to five inches below ground level and maintained that the condition existed "for many months, if not back to 2013." Nolte based his conclusions on Ussman's testimony and four Google Maps images: images one and two depicting a street view of 19 Gillette Street from August 2013, while images three and four depict a street view of 20 Gillette Street from July 2018. Based on the Google Maps images and testimony, he opined that it was "evident from the Google image photograph taken in 2013, that the water meter cover was below curb level" and that the Borough "had actual notice of this hazardous condition when its meter

8

readers read the meter every quarter" and based on the fact that they "were at this location more than normal, between October 2017 and the date of this accident, July 18, 2018."

The Borough's liability expert, Walter M. Wysowaty, P.E., offered two reports. In his initial report, he opined, "it is evident that the condition of the water meter pit allegedly encountered by the plaintiff had only existed for a short period and that the Borough of Keansburg was not provided any notice of the condition prior to July 23, 2018, after the plaintiff's alleged fall." In Wysowaty's supplemental report addressing Nolte's findings, he stated Nolte's conclusions were "speculative considering the poor resolution in the 2013 Google image" and that the images were "not adequate to determine any accurate or reliable measurement with respect to" the alleged condition of the water meter on the date of plaintiff's accident. His criticism of Nolte's report was that it "[could not] support an engineering or scientific opinion regarding the timeframe of the formation of the condition allegedly encountered" by plaintiff.

To sustain his claim against the Borough, plaintiff avers he suffered permanent injuries to his left knee when he fell as a result of the water pit.[4]

---

[4] Plaintiff initially alleged injuries to his left knee and left ankle as a result of the accident, but his medical expert report discusses only the permanent and

Plaintiff was evaluated and treated by Dr. Jeffrey Van Gelderen between July 23, 2018, and October 10, 2018, who performed a left knee arthroscopic partial medial meniscectomy and left knee arthroscopic partial lateral meniscectomy. Plaintiff underwent post-operative physical therapy following the surgery but testified that therapy ended in 2020. As to plaintiff's subjective complaints, during depositions, he testified his knee was feeling "pretty good," with only a "little pain now and then but not much," and that since the incident, he had refrained from certain physical activities such as squats with weight because his knee was not "a hundred percent," stating that he "needs a little bit more of, a couple years maybe just to get the leg back in shape."

Plaintiff's medical expert, Cary Skolnick, M.D., concluded that plaintiff's left knee was "permanently weakened . . . and there has been permanent loss of mobility." He also noted that his injuries have "produced demonstrable medical evidence of an objective nature of restriction in function, and in the material lessening of patient's working ability . . . and an interference with the patient's ability to perform activities of daily life." Dr. Skolnick indicated plaintiff would have permanent restrictions "on his ability to twist and turn, to stand for long

___

substantial nature of the injury to his left knee. Thus, we consider only the permanency of the injury to plaintiff's left knee.

10

periods of time, and to walk for long periods of time." He also opined that any sports activities "will be markedly limited" and that he expected plaintiff to "suffer from chronic intermittent pain" with "routine activities" because of the "damage done to [the] knee."

The Borough disputes that plaintiff suffered permanent injury as required by the TCA and offered the report of medical expert, Dr. Kevin J. Egan, M.D., FAAOS. Dr. Egan opined his "physical examination fail[ed] to reveal objective findings that would support any subjective complaint of discomfort." Further, with respect to both the left knee and left ankle injuries, Dr. Egan found no support that plaintiff suffered any "loss of mobility function" following care "for this involvement."

After the completion of discovery, the Borough moved for summary judgment, arguing plaintiff had failed to state a claim for public entity liability under N.J.S.A. 59:4-2 for injuries caused by a dangerous condition of property.

On April 1, 2022, the parties appeared for oral argument before the motion judge, and on April 11, 2022, the judge issued an order and written statement of reasons granting summary judgment in favor of the Borough. For purposes of this motion, the judge assumed, based on the parties' arguments, that plaintiff had presented evidence that the water meter presented a dangerous condition at

11

the time of his accident, the dangerous condition was the proximate cause of his injuries, and "the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred."

Based upon the record, the judge determined that plaintiff had not established the Borough had actual or constructive notice of the alleged condition that had caused plaintiff's injuries because he failed to demonstrate how long the condition existed prior to the accident. More specifically, the judge noted that plaintiff's expert had presented a net opinion as he had not "provide[d] any factual basis or engineering standard" for his opinion that the depressed condition of the water meter at 27 Gillette Street existed "for many months, if not back to 2013" or otherwise "describe[d] in his report his basis for concluding that the Google images show the area where plaintiff fell."

Furthermore, on the issue of permanency of plaintiff's injuries, the judge concluded that plaintiff's expert's description of the impact that the injury had on plaintiff's life was "inconsistent with [plaintiff's] own deposition testimony." The judge found plaintiff had offered "subjective complaints of pain," which were inadequate to support a finding of "permanent loss of bodily function that is substantial." This appeal followed.

I.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582(2021) (quoting R. 4:46-2(c)).

When considering a summary judgment motion in a TCA case in particular, "a judge should consider the declared legislative policy . . . that 'recognize[s] the difficulties inherent in a public entity's responsibility for maintaining its vast amounts of public property.'" Maslo v. City of Jersey City, 346 N.J. Super. 346, 350 (quoting Polyard v. Terry, 160 N.J. Super. 497, 506 (App. Div. 1978)).

Under the TCA, "public entities shall only be liable for their negligence within the limitations of [the] act and in accordance with the fair and uniform principles established herein," N.J.S.A. 59:1-2, and our Supreme Court has consistently held "[a]ll of the provisions of [the] act should be construed with a view to carry out the above legislative declaration," Coyne v. Dep't. of Transp., 182 N.J. 481, 488 (2005) (citing Malloy v. State, 76 N.J. 515, 518-19).

"The Act's 'guiding principle' is 'that immunity from tort liability is the general rule and liability is the exception.'" O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 345 (2019) (quoting Coyne, 182 N.J. at 488). N.J.S.A. 59:4-2 addresses a dangerous condition of public property and provides as follows:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> > a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
> >
> > b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
>
> [Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 125 (2001) (quoting N.J.S.A. 59:4-2).]

14

Under the TCA, a public entity's liability for injuries caused by a condition on its property depends upon establishing the following elements:

> the existence of a "dangerous condition," that the [dangerous] condition proximately caused the injury, that [the dangerous condition] "created a reasonably foreseeable risk of the kind of injury which was incurred," that either the dangerous condition was caused by a negligent employee or the entity knew about the condition; and the entity's conduct was "palpably unreasonable."
>
> [Stewart v. New Jersey Tpk. Auth./Garden State Parkway, 249 N.J. 642, 656 (2022) (citation omitted) (quoting N.J.S.A. 59:4-2).]

## II.

In this appeal, consistent with the judge's opinion, the parties do not dispute elements one through three; thus, the issues presented are limited to whether "either the dangerous condition was caused by a negligent employee or the entity knew about the condition" and whether defendant's conduct was "palpably unreasonable." N.J.S.A. 59:4-2. We also address plaintiff's argument that he suffered a permanent injury to his left knee.

Plaintiff argues the court erred by finding as a matter of law: (1) plaintiff's failure to provide evidence establishing the length of time the hole was present on the property rendered plaintiff unable to satisfy his burden of proving the Borough had "constructive notice" of the alleged dangerous

15

condition prior to plaintiff's fall; (2) plaintiff presented no evidence establishing his injuries were caused by any "palpably unreasonable" action or omission by the Borough, N.J.S.A. 59:4-2; (3) Nolte's report constituted an inadmissible net opinion; and (4) plaintiff's injuries were not permanent and substantial.

On the first two points raised by plaintiff, the Borough argues that the court correctly found plaintiff cannot establish liability under the TCA because the Borough did not cause the dangerous condition and had no actual or constructive notice of it; therefore, it cannot be found to have acted in a palpably unreasonable manner.

It is plaintiff's burden to prove that the public entity had actual or constructive notice of the dangerous condition. Notice pursuant to N.J.S.A. 59:4-2(b) requires a plaintiff to show the "public entity had actual or constructive notice of the dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." N.J.S.A. 59:4-2(b). Actual notice requires plaintiff to show the public entity "had actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a). In contrast, a public entity is deemed to have constructive notice "only if plaintiff establishes that the condition had existed for such a period of time and

16

was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b).

Here, to establish actual notice, plaintiff argues that the Borough "owns and is responsible for the maintenance of the water meter" at issue and is responsible for "backfill[ing] the meter if there [is] work done by [the Borough] for any reason." Specifically, plaintiff contends the Borough was responsible for backfilling the area surrounding the meter when it replaced the meter on November 28, 2017. He also argues that approximately one month prior to July 18, 2018, he learned from his son that the Borough had come to the property to service the meter because of a water leak and had "dug a hole" near it in order to "shut the main [line] off." Plaintiff also claims his son said that when he arrived on the property at the end of the same day, he noticed the Borough had been "working on it" because "they had a cone and some stuff around it" before the cone and related construction items were "taken away" on the same day. However, plaintiff's claim is directly contradicted by his son's deposition testimony wherein his son testified he never called the Borough to report a water leak, to shut off the water service, or to perform repairs in the months prior to July 2018. Similarly, plaintiff's nephew also denied knowledge about a leak

around this timeframe, and in fact, testified he had never personally seen the water meter and was rarely at the property.

The judge issued a comprehensive and well-reasoned decision addressing all the factors necessary to sustain a TCA claim. She ultimately found that "[t]he meter pit—the area surrounding the meter—would be filled in, or raised, by the[Borough] only if—[they] caused the meter pit to sink in or otherwise become lower than the surrounding property," but that "[p]laintiff has not shown that the [Borough] caused damage to the meter pit, thus necessitating a repair of the meter pit, and thus no showing has been made that the [Borough] bear[s] any responsibility for injuries sustained as a result of the condition . . . ."

Based on our de novo review of this record, we discern no basis to disturb the motion judge's findings and conclusion that "no evidence has been presented that the Borough was provided with actual notice of the dangerous condition of the water meter" that plaintiff contends caused his injury. From this record, we discern that neither plaintiff nor the property owner nor any other employee at this construction site made any reports or complaints concerning the condition of the water meter. In fact, the sole complaint made regarding the water meter, which all the parties acknowledge, is the December 28, 2017 request to shut off the water to the property. In the absence of competent evidence, including

18

admissible expert testimony and proofs showing any reports were made about the condition of the water meter prior to the accident, plaintiff has not established the Borough had actual notice thereof.

Given plaintiff's reliance on his expert's opinion to establish his claim the Borough had at least constructive notice of the alleged dangerous condition, and the court's determination that Nolte's expert report constituted an inadmissible net opinion, we turn to address this point.

"The net opinion rule is a 'corollary of [N.J.R.E. 703],'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (alteration in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)), and "requires that an expert 'give the why and wherefore'" supporting an opinion "'rather than a mere conclusion,'" id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). "The net opinion rule . . . mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "For example, 'a trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert'" offers an opinion. Davis v. Brickman Landscaping, Ltd., 219

19

N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011)). "[A]n expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions[] but testifies only to a view about a standard that is 'personal.'" Ibid. (quoting Pomerantz Paper Corp., 207 N.J. at 372). And when reviewing a "trial court's decision to admit expert testimony" we apply "[a] deferential approach," "reviewing it under an abuse of discretion standard." Townsend, 221 N.J. at 53 (quoting Pomerantz Paper Corp., 207 N.J. at 371-72).

Here, Nolte opined that a "Google image from 2013 shows that the ground surface at the back of the street curb was not at the level of the curb and the water meter cover was not at that level . . ." to support his ultimate conclusion the "water meter pit was depressed, about four to five inches (4" to 5") below ground level for many months, if not back to 2013." Based on this image, Nolte theorized that the Borough had "actual notice" of the condition.

The court flatly rejected Nolte's opinion as inadmissible stating, "[a]ny opinion based entirely on the Google Maps 2013 screen shots attached to Dr. Nolte's report, however, cannot be presented to the jury, . . ." The judge specifically noted that:

> [a]ssuming that Dr. Nolte is qualified to provide testimony as an expert in the field of engineering, [he]

cannot be permitted to testify to something that is not in fact visible in an image being shown to the jury highlighting the "poor and very dark" quality of the images ultimately finding that the images could not "support any opinion that a four[-] to[-] five[-] inch depression in the water meter cover existed in August 2013.

We are persuaded the judge correctly concluded that the images relied upon by Nolte lacked any evidentiary value and that Nolte failed to explain any methodology or standard upon which he based his conclusions. Moreover, Nolte's explanation that he based his opinion on his "education, training[,] and experience in engineering," is wholly insufficient as he failed to offer any factual bases or reliable methodology concerning the critical issues of notice and timing of the development of the hole around the water meter pit. See Townsend, 221 N.J. at 55. Indeed, even his conclusion is speculative—when he stated that the condition existed "for many months, if not back to 2013"—and is thus unreliable.

In the absence of reliable proofs, an expert's opinion is inadmissible when, as in this case, he cannot offer objective support for the opinions but testifies only to a view about a standard that is personal. Similarly, Nolte's conclusion that the Borough "was at the location more than normal between October 2017 and . . . July 18, 2018" and, thus, had "more than sufficient opportunity to report

21

the depressed condition of four to five inches (4" to 5")" is also inadmissible because it presupposes that the depression around the water meter pit pre-existed the meter readings when this record, including his report, does not include proof or evidence concerning the timing of the formation of the hole surrounding the water meter. We therefore reject plaintiff's contention that the judge abused her discretion by failing to consider Nolte's opinion as competent evidence in support of his opposition to the Borough's summary-judgment motion.

Next, the motion judge proceeded to address the issue of constructive notice of the dangerous condition. Relying upon the undisputed facts in the record, the motion judge concluded that "no competent evidence has been presented as to when the condition complained of was created." In considering these arguments and the summary-judgment record, the judge concluded that:

> no evidence has been presented that any representative of 46 4th Street, which owned the site and had individuals working on the site, had seen the condition before Coffey's accident. As no evidence has been presented that would indicate that the condition was of "such an obvious nature" that the Keansburg defendants should have been aware of it with the exercise of due care, plaintiff has failed to show constructive notice by the Keansburg defendants.

Because even giving plaintiff a generous reading of the summary-judgment record, including a finding that the water meter was in a dangerous

22

condition and viewing the evidence in the light most favorable to plaintiff, he has not established the sunken area around the water meter "had existed for such a period of time and was of such an obvious nature that [the Borough], in the exercise of due care, should have discovered the condition and its dangerous character." Polzo, 209 N.J. at 67 (quoting N.J.S.A. 59:4-3(b)). And, the "mere '[e]xistence of an alleged dangerous condition is not [in of itself] constructive notice of it.'" Arroyo v. Durling Realty, LLC, 433 N.J. Super. 238, 243 (App. Div. 2013) (alteration in original) (quoting Sims v. City of Newark, 244 N.J. Super. 32, 42 (Law Div. 1990)).

Here, there is no dispute that the hole surrounding the water meter was grass covered. Nevertheless, plaintiff contends "[d]efendants were on notice for at least five (5) years of the dangerous condition, which they chose to ignore." Plaintiff further argues that "there is ample evidence to suggest the Borough repeatedly read or serviced the meter while it was in such an admittedly dangerous condition, failing to address said condition in any way."

Our Supreme Court has held that "whether a public entity is on actual or constructive notice of a dangerous condition is measured by the standards set forth in N.J.S.A. 59:4-3(a) and (b), not by whether [for example] 'a routine

23

inspection program' by the [public entity] . . . would have discovered the condition." Polzo v. Cty. of Essex (Polzo II), 209 N.J. 51, 68 (2012).

Polzo involved a bicyclist who had died from injuries sustained when he fell from his bike onto a circular depression on the shoulder of a county road. Id. at 56-57. Just five weeks before the plaintiff's accident, the defendants not only inspected all 2.6 miles of the county road but filled potholes in the process. Id. at 68. The Court, considering "whether [defendants]—five weeks before the accident—should have discovered the depression on the shoulder of the road . . . and determined that it was a 'dangerous condition'" within the meaning of the TCA, id. at 75, held that the plaintiff had failed to establish that the "shoulder depression was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." Id. at 73-74.

As an initial matter, we consider relevant the Borough Superintendent's description of how the Borough's employees perform the quarterly readings of water meters. According to Ussman's deposition testimony:

> [w]hen members of the Water and Sewer Department go out to check the meter, . . . they don't necessarily check the actual meter. There is a censor on the cover that they actually touch with a piece of equipment that reads the meter, but if the meter pit itself is damaged or below ground or, you know, if they see any issue with

24

it, they can make notes in their equipment at that time. . . . If there was a report, we would have it. I don't – I don't believe any report was generated during the prior meter reading of this meter.

Although the Borough concedes reading the water meter and responding to a request to shut off water service, it maintains that there was no evidence of any dangerous condition at the site prior to plaintiff's fall. The Borough also disputes plaintiff's contention that there was evidence sufficient to defeat summary judgment. Moreover, the Borough maintains that despite alleging Borough employees were on the property to dig a hole approximately one month before the incident, plaintiff later admitted he did not observe any such actions on the part of the Borough. To be sure, plaintiff's son and nephew also denied contacting the Borough about a water leak within a month of the plaintiff's fall, the last report being in December 2017. The Borough also referenced plaintiff's statement that his son had dug a hole at the water line so an unidentified plumber could work on the water line, although he never provided any contact or identifying information for this person.

Although we accept that the Borough read the water meter at least quarterly, turned off the water in December 2017, and was on site to inspect the meter on March 6, 2018, and April 2, 2018, we agree with the motion judge that nothing in this record supports plaintiff's theory that the Borough was aware that

the area around the meter was in fact sunken so as to create a hole—a dangerous condition—or how long such a condition existed. We also find significant that despite plaintiff's contentions, he acknowledged performing contracting work on the property prior to July 18, 2018, but claims never to have noticed the hole surrounding the water meter because it was covered by grass.

Moreover, even if plaintiff could establish that Borough employees were aware of the sunken area around the meter and failed to make repairs, plaintiff similarly failed to establish that the Borough's actions were palpably unreasonable. The single argument plaintiff makes on appeal is that "[c]ontrary to the . . . court's decision, the [Borough] [was] on notice for at least five (5) years of the dangerous condition, which they chose to ignore. Such inaction is more than mere negligence and should be presented to a jury."

Having previously concluded that the judge correctly rejected plaintiff's expert's opinion as a net opinion, we are further convinced the judge correctly determined plaintiff failed to present sufficient evidence establishing that "the action or inaction on the part of the public entity in protecting against the condition was 'palpably unreasonable.'" Kolitch v. Lindedahl, 100 N.J. 485, 493 (1985). The term "palpably unreasonable" implies behavior that is patently unacceptable under any given circumstance. Muhammad v. N.J. Transit, 176

N.J. 185, 195 (2003) (quoting Kolitch, 100 N.J. at 493). Because the burden of proving palpable unreasonableness of the entity's action or inaction rests with the plaintiff, Coyne 182 N.J. at 493, unless he can show the public entity's action was "manifest and obvious that no prudent person would approve of its course of action or inaction," there is no genuine issue of fact appropriate for submission to the jury. Kolitch, 100 N.J. at 493.

Here, the record lacks competent evidence directly or circumstantially supporting the claim that the Borough acted in a palpably unreasonable manner by failing to discover or otherwise repair the water meter hole, the procedure in which the Borough investigated such incidents, or how it responded to plaintiff's accident. Nor did the record contain evidence suggesting any prior complaints about the condition of the water meter by plaintiff or the property owner. See Carroll v. New Jersey Transit, 366 N.J. Super. 380, 390-91 (App. Div. 2004) (holding "plaintiff's claims of palpable unreasonableness presented no jury question" where "the record [was] devoid of any evidence of a history of similar incidents or complaints, or a demonstrable pattern of conduct or practice.")

As we discussed, it was unrefuted that the Borough inspected the water meter on March 6, 2018, performed a quarterly reading on April 2, 2018, and again during the first week of June 2018. And, nothing in the record suggests

27

the Borough should have known to inspect the water meter for damage where plaintiff fell, as plaintiff stated that the hole was completely covered by grass and just looked like "flat ground." Thus, we reject plaintiff's argument that the Borough acted in a palpably unreasonable manner in failing to discover the condition that caused his injuries.

III.

The last issue we consider is whether plaintiff established that he had suffered a permanent and substantial injury as required prior to recovery under the TCA. The judge accepted, for purposes of the motion, that the hole surrounding the water meter constituted a dangerous condition and that that dangerous condition was the proximate cause of plaintiff's injury. However, even if the judge had found the Borough had actual or constructive notice of that dangerous condition, plaintiff's claim would still have failed on the issue of permanency of his alleged left knee injury.

To survive summary judgment, plaintiff was required to demonstrate "(1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial." Ponte v. Overeem, 171 N.J. 46, 51 (2002). The motion judge referred at length to the Court's decision in Ponte, 171 N.J 46, where the Court determined that the plaintiff's knee injury, which required surgery, did not meet

the permanent loss threshold, in part because the record was lacking as to the extent and permanency of his impairments. Id. at 47.

Ponte underwent arthroscopic knee surgery, including a partial medial meniscectomy, partial synovectomy, and chondroplasty of the patella in the right knee. Id. at 49. However, the court determined, he lacked evidence of permanency because he offered no objective evidence of a physical manifestation of permanent and substantial injury to the knee, and no evidence of a substantial restriction in the function of the knee, such as a limited range of motion, impaired gait, or restricted ability to ambulate. Id. at 54.

Here, in rejecting plaintiff's argument of a permanent injury to his left knee, the judge relied upon a review of the combination of his deposition testimony and medical proofs. At deposition, plaintiff described his injury as "feel[ing] pretty good right now," with only a "little pain now and then but not much," and stated that he refrains from certain physical activities such as squats with weight because he did not feel that his knee was "a hundred percent," and statements that he "needs a little bit more of, a couple years maybe just to get the leg back in shape." Plaintiff further maintains he had not received any additional treatment for this injury since 2020. Plaintiff's expert, however, opined that plaintiff would have permanent restrictions on his ability to twist

29

and turn, to stand for long periods of time, and to walk for long periods of time. He also opined any sports activities "will be markedly limited" and that he expected him to suffer from chronic intermittent pain upon routine activities because of the damage done to his knee.

We are satisfied that the motion judge correctly relied on <u>Ponte</u>, 171 N.J. 46, in finding that Dr. Skolnick's finding of permanency and description of the impact of the injury on plaintiff's life was "inconsistent with [plaintiff's] own deposition testimony." On the record before us, plaintiff failed to establish through objective evidence that he had sustained a permanent and substantial injury to his knee. Following surgery, plaintiff remained fully capable of performing in his construction job and made no substantive complaints about impairments regarding his avocational pursuits. The discomfort experienced while performing such activities was insufficient to meet the TCA threshold. The judge concluded that plaintiff offered "subjective complaints of pain," which were, in her view, inadequate to support a finding of "permanent loss of bodily function that is substantial."

On this record, we find no basis to disturb the grant of summary judgment to defendant. Plaintiff's liability expert report constitutes an inadmissible net opinion. Moreover, the judge correctly determined plaintiff had failed to present

sufficient evidence to defeat the Borough's motion for summary judgment—showing actual or constructive notice of the dangerous condition and that the Borough had acted in a palpably unreasonable manner by failing to remediate the sunken area around the water meter pit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION